**VARIBUS CORPORATION, Appellant,**

v.

**SOUTH HAMPTON CO., Appellee.**

**No. 8663.**

Court of Appeals of Texas, Beaumont.

Oct. 15, 1981.

Rehearing Denied Nov. 5, 1981.

John Tucker and Howell Cobb, Beaumont, for appellant.

George Weller, Beaumont, Rufus Wallingford, Houston, for appellee.

KEITH, Justice.

Defendant below appeals from a judgment based upon an instructed verdict in a suit for damages sustained because of an alleged breach of a contract to purchase fuel oil. Although several issues were submitted to the jury, when it was unable to agree upon a verdict, the trial court granted plaintiff's motion for an instructed verdict and also instructed the jury as to the specific amount of damages it should find for the plaintiff.

The appeal is based upon a number of points of error, only one of which will be reached because of our view of the controlling question. We reverse the judgment of the trial court and render judgment for the defendant for the reasons now to be stated.

On January 14, 1975, the plaintiff "Seller" and the defendant "Buyer" entered into an elaborate written contract for the sale and purchase of fuel oil at "Seller's Terminal" to be located upon the Neches River in the vicinity of Beaumont. At the time of the execution of the contract, the terminal was not in existence.

Section 1.04 of the contract required Seller to construct a terminal, the provision

being set out in the margin.[1] Other provisions in the contract provided that the quantity and quality of the product would be "determined by SELLER'S shore tank strappings and shore tank sample at the time of each delivery . . . ." Sec. 1.05(a). Title to the product, and risk of loss passed to Buyer "as the Product passes through the flange connection between BUYER'S vessel and SELLER'S Terminal loading line and into BUYER'S vessel." Sec. 1.07.

Another paragraph provided that if Seller had not completed the terminal by August 1, 1975, Buyer could cancel the contract, but, in such event, Seller had the option to supply Buyer with product of equal quantity and quality appropriately adjusted in price for any differential in transportation charges. This provision in the contract did *not* come into play in the dispute.

Instead, Buyer elected to terminate the contract under another provision in the contract reading:

"In the event SELLER'S Terminal is not completed by January 1, 1976, *as planned and contemplated, for any reason, including force majeure,* BUYER shall have the right to cancel this contract for reason of SELLER'S nonperformance by giving SELLER 30 days prenotification of cancellation with such prenotification to be given anytime during the month of January 1976." (emphasis supplied)

Able counsel representing the parties have filed lengthy and elaborate briefs wherein many contentions are presented in a scholarly manner. After reviewing the entire record, we are of the opinion that counsel for the defendant has succinctly summarized the basic issue in this reply brief:

"The issue before the Court is whether the 'Terminal', as planned and contemplated by the parties, was or was not completed by January 1, 1976. Varibus contends that the undisputed evidence established that the Terminal was not in fact completed by January 1, 1976, and accordingly that it established as a matter of law that it was entitled to and did cancel the contract, relieving it of any liability for the alleged breach of contract. South Hampton, on the other hand, contends that under the undisputed evidence, it was established that the Terminal was in fact completed by January 1, 1976, and that Varibus was not entitled to cancel the contract, and accordingly, must respond in damages."

Plaintiff—South Hampton—argues that Sec. 1.04 (footnote 1, supra) treated the terminal and tankage as separate and "[t]he parties clearly did not intend to give Varibus the right to cancel this 10–year contract in the event South Hampton . . . failed to complete construction of shore tanks."

It is obvious that our preliminary inquiry must be to determine what the parties intended would constitute the "Terminal" when it was completed. There is no ambiguity in the instrument.

Plaintiff pleaded, verbatim, the provisions of Sec. 1.04 of the Contract (footnote 1, supra), which required it to construct "SELLER'S Terminal and tankage", the combined capacity at the terminal and its refinery "shall include heated storage capacity for a minimum of one hundred ten thousand (110,000) barrels of Product."

Plaintiff pleaded that prior to December 31, 1975, it had completed construction of heated tank storage at its refinery of approximately 53,000 barrels, a pipeline from the refinery to the terminal and 86,000 "barrels of barge storage at the terminal . . . ."

It also alleged that on December 31, 1975, it "was then ready and able to perform the primary intent and purpose of the contract . . . ."

---

1. "1.04 *Facilities.* SELLER will construct, or cause to be constructed, SELLER'S Terminal and tankage. The combined capacity of such tankage at SELLER'S Terminal and refinery shall include heated storage capacity for a minimum of one hundred ten thousand (110,000) barrels of Product. Product is to be maintained at 125°F. minimum and 200°F. maximum temperature. SELLER will also construct, or cause to be constructed, a pipeline to move Product from SELLER'S Refinery to SELLER'S Terminal."

Plaintiff stipulated in open court that on January 1, 1976, "no shore tanks were constructed at this facility", the terminal. Additionally, numerous pictures taken subsequent to January 1 disclose very clearly that no tanks had been constructed at the terminal.

Executive vice-president Dana of South Hampton, the man primarily in charge of the dealings with Varibus, was interrogated concerning the building of storage tanks at the terminal, and one question and answer is important:

"Q. ... Isn't it true that this contract required South Hampton to construct at seller's terminal at least one shore tank from which deliveries are to be made into vessels or barges of the buyer?

"A. I believe that we intended and ultimately did build one shore tank, yes, sir."

Mr. Dana was also questioned as to the facilities in place at the terminal on January 1, 1976, whereby the quantity and quality of the product could be determined by "shore tank strappings and shore tank sample" as provided in Sec. 1.05(a) of the contract. This brought about a judicial stipulation "that there was no way on January 1 that the quantity and quality could be determined from shore tanks at seller's terminal."

The last bit of testimony introduced by either party came from plaintiff's officer Dana when cross-examined with reference to the construction of shore tanks at the terminal:

"Q. Have you had plans when you signed this contract to have those [shore tanks] completed by January 1, 1976?

"A. I believed we hoped to."

Answers to requests for admissions also established that "there were no facilities at said terminal to maintain the Product at a minimum of 125° F. and 200° F maximum temperature" and that the "Product in barges was not maintained at the heated temperature."

From our review of the voluminous record, only some of which is set out herein, we are of the opinion that plaintiff had not complied with the terms of the contractual provision found in Sec. 1.04 (footnote 1), nor had it constructed storage tanks by which tank strappings and shore tank samples could determine the quantity and quality of the product to be delivered to the defendant.

The broad and all-inclusive language used by the parties in the cancellation clause relied upon by the defendant is dispositive of the question.

In *Crystal City v. Lo-Vaca Gathering Co.*, 535 S.W.2d 722, 724 (Tex.Civ.App.—El Paso 1976, writ ref'd n. r. e.), the court reviewed many of the Texas decisions on the subject, holding:

"The courts of this state have consistently given effect to provisions which give a right or option to either party to terminate a contract. *Maddox Motor Co. v. Ford Motor Co.*, 23 S.W.2d 333 (Tex.Com. App. 1930, opinion approved); *Dallas County Water Control and Improvement District No. 7 v. Imgram*, 395 S.W.2d 834 (Tex.Civ.App.—Dallas 1965, writ ref'd n. r. e.); *Kree Institute of Electrolysis, Inc. v. Fageros*, 478 S.W.2d 569 (Tex.Civ.App. —Waco 1972, no writ)."

We have given careful consideration to the principal argument interposed by plaintiff:

"South Hampton submits that when the accepted rules of contract interpretation are applied to this agreement, the requirement of South Hampton to construct tankage was not a condition to Varibus' obligation to perform its part of the bargain. We start with the basic premise that 'language will not be construed as a condition precedent when another reading of the contract is possible.' ... The reason is that conditions precedent are unfavored by both law and equity. . . ." (citations omitted)

We do not agree with plaintiff's contention. The defendant invoked the defini-

tion of "Termination" as set out in *Tex.Bus. & Comm.Code Ann. § 2.106(c) (1968).*[2]

The trial court, by granting plaintiff's motion for a directed verdict, rewrote the contract of the parties. The Court then denied the right to the termination granted to defendant by the contract; in lieu thereof it substituted plaintiff's theory of substantial performance. Defendant was not required by the contract to accept the product from a pipeline, rather than from shore tanks; it was entitled to have the quantity and quality of the product determined before the product was received into its barges.

We do not accept plaintiff's argument that since the requirements for the determination of quantity and quality of the product at the time of delivery were for its benefit, it could waive such requirements and force defendant to accept an alternative method of determination of such facts. This theory, if accepted, would amount to a unilateral modification of the contract in violation of Sec. 6.05 of the contract.[3] In Sec. 6.09 it was provided: "Time is of the essence of this Agreement."

 The termination clause is clear and unambiguous and there is nothing in the contract which casts any doubt on the specific agreement that time was of the essence thereof. Plaintiff did not comply with the completion provisions of the contract as shown by the undisputed evidence in the record. The trial court erred in entering judgment for the plaintiff. See *Alco Oil & Gas Corp. v. Concord Oil Co.,* 375 S.W.2d 463, 465 (Tex.Civ.App.—San Antonio 1964), aff'd 387 S.W.2d 635, 637 (Tex. 1965).

In passing upon the question under consideration, we do so under the rules enunciated in *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976), and *Douglass v.*

*Panama, Inc.,* 504 S.W.2d 776, 777 (Tex. 1974).

We sustain defendant's first point of error contending, in substance, that the trial court erred in overruling defendant's motion for judgment non obstante veredicto because the undisputed evidence showed that defendant "properly exercised its right to cancel the contract by reason of South Hampton's failure to complete the Terminal by January 1, 1976." So holding, the judgment of the trial court is reversed and judgment rendered that the plaintiff take nothing by reason of its suit.

Reversed and Rendered.

---

2. *§ 2.106(c):* " 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives."

3. Sec. 6.05: "This Agreement . . . may not be changed or terminated orally and no attempted change, termination or waiver of any of the provisions hereof shall be binding unless it is in writing, signed by the parties hereto, and specifically designates the portions hereof so amended, terminated or waived."