733 F.2d 1108
 38 UCC Rep.Serv. 1137
 SOUTH HAMPTON CO., Plaintiff-Appellee Cross-Appellant,
v.
STINNES CORP., et al.,
Defendants-Third-Party-Plaintiffs-Appellants Cross-Appellees,
v.
UNITED PETROLEUM DISTRIBUTORS, INC.,
Third-Party-Defendant-Appellee Cross-Appellant.
 No. 80-1803.
 United States Court of Appeals,
Fifth Circuit.
 May 23, 1984.
 
 Mehaffy, Weber, Keith & Gonsoulin, Dewey J. Gonsoulin, Beaumont, Tex., Cahill, Gordon & Reindel, Thomas F. Curnin, New York City, for Stinnes Corp., et al.
 Fulbright & Jaworski, Rufus Wallingford, Houston, Tex., Weller, Wheelus & Green, Beaumont, Tex., for South Hampton Co.
 William A. Harrison, Bryan A. Domning, Houston, Tex., for United Petroleum Distributors, Inc.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before CLARK, Chief Judge, BROWN and RUBIN, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 This breach of contract diversity case turns on the interpretation of contracts by which a petroleum refiner agreed with an oil buyer to construct a petroleum terminal and to deliver large quantities of diesel and heavy oil at the completed terminal over a ten-year period. Directed by a Texas court's interpretation of a notably similar contract, subsequent to the trial of this case, we conclude that the refiner breached the contract and, therefore, vacate the district court's judgment in favor of the refiner.
 
 
 2
 The buyer's counterclaim sought damages from the refiner-seller for fraudulently inducing it to enter the contract and for overpricing products sold. The district court entered a directed verdict on this claim. We conclude that there was sufficient evidence to warrant submission of that issue to the jury. Therefore, although the alleged fraud and overpricing affected only the relatively small quantity of oil actually purchased, we reverse the judgment on the counterclaim and remand for a trial of that claim.
 
 
 3
 A third party, who contracted to repurchase the oil from the initial purchaser, asserted a claim for indemnity under an alleged hold-harmless contract and under the Texas Deceptive Practices Act. We affirm the judgment in favor of the third party on the hold-harmless claim, but conclude that it was not a consumer entitled to invoke that Act.
 
 I. FACTS
 
 4
 South Hampton Company, which operated a petroleum refinery at Silsbee, Texas, entered into two contracts with Stinnes Corporation, a diversified holding company operating through its Stinnes Oil & Chemical Co. division. One contract required South Hampton to deliver large quantities of diesel oil, the other to deliver large quantities of heavy oil. Each required Stinnes to buy the oil and each required South Hampton to construct a petroleum terminal on the banks of the Neches River, near Beaumont, Texas. Stinnes simultaneously entered into two contracts with United Petroleum Distributors for resale to United of the products purchased by Stinnes from South Hampton at a markup of 42cents per barrel.
 
 
 5
 All four contracts contained identical terms, which we paraphrase as follows:
 
 Terminal:
 
 6
 Each required South Hampton to construct a terminal at the refinery with tankage for 110,000 barrels of heavy oil and 50,000 barrels of diesel.
 
 Terminal Facilities and Functions:
 
 7
 Each required that (a) shore storage tanks were to be an integral part of the terminal and (b) the terminal was to be a facility at which certain basic functions--including acurate pre-transit testing, measurement, and certification of product and passage of title, liability, and risk of loss--would be performed. Each provided for performance of these functions "at the time of each delivery" using "Seller's shore tank strappings" and "Seller's shore tank sample" from the "shore tanks at Seller's terminal"; each provided that "Seller's shore tank gauges shall govern"; each established prices "F.O.B. Seller's tank at its Beaumont Texas terminal"; each made Seller's terminal the "point of delivery" for passage of title, liability, and risk of loss; and each required certified quantity and quality inspection reports to be delivered "promptly upon lifting."Right to Cancel:
 
 
 8
 Each estimated the completion date of the terminal as August 1, 1975 and provided buyer a "right to cancel" for "non-performance" on 30 days "prenotification" if the terminal were "not completed" by January 1, 1976 "for any reason, including force majeure."
 
 Time Was of the Essence:
 
 9
 Each provided that "time is of the essence of this Agreement."
 
 The Limited Option to Cure:
 
 10
 Each gave South Hampton the "option" either to accept the cancellation notice or to "offer" to provide Buyer with product "under the same pricing conditions as provided for herein" from an "alternate [sic] source." If the seller decides to exercise this option, it "shall have performed the contract and Buyer shall take and pay for product as though ... produced and delivered through Seller's own pipeline and terminal facilities." Each further stated that, even if performed "elsewhere," delivery still had to be "in accordance with the terms of this contract."
 
 Title and Risk of Loss:
 
 11
 Each provided that "title to, and risk of loss, and liability for, all Product delivered hereunder shall pass from Seller to Buyer as the Product passes through the flange connecting Buyer's Vessel to Seller's Terminal loading line ... or other mutually agreeable place of delivery."
 
 The Price Formula and Example:
 
 12
 Each provided for "cost plus" formula pricing--the price of product to be determined by the "Actual Cost of Crude Oil plus Product Margin "; each defined the "Actual Cost of Crude Oil" as "the cost [per barrel] to Seller of purchasing and delivering 0.4 weight percent maximum sulphur crude oil and other feedstocks to the refinery in the preceding month...."; each defined "Product Margin" as the sum "expressed in dollars per barrel" of specified refiner-wide costs, expenses, and profit.
 
 
 13
 Each contained a specific price example that applied the pricing formula to a particular pre-contract base month (April, 1974) and represented the resultant benchmark price and component costs applicable for that base month: "The price of heavy fuel oil as of April, 1974 was $10.04 per barrel (Crude Oil $8.19 + Product Margin $1.85 = $10.04)."
 
 
 14
 Each gave Buyer a right of audit and required South Hampton to "maintain accounting records in a manner suitable" thereto.
 
 
 15
 Each provided that retroactive adjustment of South Hampton's crude oil costs were to be passed on to the buyer "on a penny-for-penny" basis.
 
 The Merger Clause:
 
 16
 Each expressly "superceded all prior agreements" and future oral modifications.
 
 
 17
 In March 1975, South Hampton began delivering product under the contracts from its facilities at Hawkins Slip, on the Neches River, to barges chartered by United or for its account by Stinnes. United later contended that it was experiencing significant losses in volume of deliveries due to mismeasurements and was lifting product in tows too small to be commercially feasible. In addition, United contended that it was paying prices far above those being charged on the open market. Addressing both Stinnes and South Hampton directly, United complained repeatedly about these problems and about South Hampton's failure to complete the terminal. South Hampton's chief executive officer, Marvin A. Bomer; Stinnes's president, Thomas H. Pierson; and United's president, Edward J. Fourticq; attended various meetings in an effort to resolve these problems. Stinnes's position was that they were temporary in nature and would end when the terminal was completed.
 
 
 18
 By early December 1975, it became obvious that the terminal could not be completed by January 1, 1976, and that United's problems and losses would continue. United was, therefore, threatening to cancel the contracts. Further conversations failed to resolve the problems.
 
 
 19
 United notified Stinnes on January 26 that it was cancelling both contracts. Stinnes in turn cancelled its contracts with South Hampton. South Hampton then responded to Stinnes, "you have no valid right to cancel" and refused to "accept your notice of cancellation," insisting that Stinnes accept both products "according to the pricing terms in the contract." Stinnes inquired whether this response was meant to be an offer of an alternative source or whether South Hampton was contending that the terminal facility was complete. South Hampton's reply refused to answer this inquiry, and merely asserted that product was "available for delivery to Stinnes pursuant to the terms of the contract" at the terminal site. During February and March, however, Stinnes continued to purchase heavy fuel oil from South Hampton at Hawkins Slip; but the purchases were at a reduced price.
 
 II. PROCEEDINGS
 
 20
 Unable to resolve their differences through negotiation, the contracting parties commenced a barrage of litigation. South Hampton sued Stinnes for damages resulting from wrongful termination of the heavy oil contract. South Hampton also included a similar claim regarding the diesel oil contract; but because a rising market made sales to others more profitable than sales to Stinnes, it suffered no damage as a result of termination of the diesel contract and accordingly abandoned that claim. Stinnes responded to the heavy oil contract claim by alleging in defense that South Hampton's failure to complete the terminal, particularly its failure to construct shore tanks, activated the contracts' cancellation clause. Alternatively, Stinnes alleged that South Hampton had breached the contracts by overpricing its products. Moving to the offensive, Stinnes counterclaimed for damages arising out of South Hampton's allegedly fraudulent misrepresentations concerning the pricing term of the contracts. Stinnes next asserted a cross claim against United, arguing that the nature of the contracts and their execution entitled it to indemnification from United for any liability it might incur to South Hampton. United returned Stinnes's fire, counterclaiming that, contrary to Stinnes's allegations, it was Stinnes that had agreed to hold United harmless from any loss resulting from inadequate performance. United also alleged that Stinnes had violated Texas's Deceptive Trade Practices Act, and claimed treble damages.
 
 
 21
 Stinnes did not fare well at the trial. In answer to a special interrogatory, the jury found that Stinnes, not South Hampton, breached the contracts. The jury also found that South Hampton sustained $7,574,509 damages under the heavy oil contract, but that it gained $2,995,885 profit from sale of diesel oil. The court awarded South Hampton the difference, i.e., $4,578,624. The court dismissed Stinnes's fraud claim against South Hampton, and directed a verdict against Stinnes on its indemnification-from-United theory. The jury also found that Stinnes had agreed to hold United harmless for losses incurred "as a result of taking products under its contract with Stinnes," and assessed the resulting damages at $149,320.69. Stinnes did prevail against United, however, on a motion for directed verdict on United's deceptive trade practices claim.
 
 
 22
 Stinnes timely appealed the judgment, assailing each adverse outcome and further alleging that the trial was conducted in a prejudicially improper manner. South Hampton disputed both the application of its diesel sales profits to offset its heavy oil sales losses and the method of calculating the amount of offset. United sought to overturn the court's ruling on its deceptive-trade-practices claim. We discuss in turn the issues presented by these appeals.
 
 
 23
 III. WHO BREACHED THE CONTRACT?
 
 
 24
 The parties reassert the positions they adopted at trial, but the debate has been significantly refocused by a post-judgment development.A. Interpretation of "Terminal"--the Varibus Case
 
 
 25
 A key step in identifying the breaching party depends upon whether, under Texas contract law, South Hampton's failure to complete shore tankage facilities by January 1 warranted cancellation of the contract. Resolution of this issue turns on the interpretation of the word "Terminal." If that word, as used in the contracts, unambiguously includes within its meaning completed shore tank facilities, then the district court erred in sending to the jury the question whether Stinnes's cancellation was wrongful. This preliminary determination is for the court to make; for, absent latent or patent ambiguity, the meaning of the contract is to be decided by the court.[1] A contract is not ambiguous if it is so worded that a court may properly give it a definite legal meaning. Ambiguity arises when the court is left genuinely uncertain which of the two meanings is the proper one.[2]
 
 
 26
 While this suit was pending, a similar suit between other parties was proceeding through the Texas courts; for South Hampton had also negotiated with other oil buyers regarding completion of the terminal. It had entered into a contract with Varibus Corporation that was, in all relevant respects save those mentioned below, identical to the Stinnes and United contracts. Indeed, the Varibus contract had served as a model for the Stinnes contract. Varibus's contract gave it the right of cancellation if the "Terminal," the same terminal involved in the South Hampton-Stinnes contract, were not complete on January 1, 1976. Varibus, like Stinnes, had exercised its cancellation right on the basis that the "Terminal" was not complete; and it also had been sued by South Hampton for breach of contract.
 
 
 27
 While the present case was pending on appeal, the Beaumont Court of Civil Appeals decided the Texas case. Varibus Corporation v. South Hampton, 623 S.W.2d 157 (Ct.Civ.App.1981), writ ref. n.r.e. (1982). It held that there was no ambiguity in the contract, and that South Hampton had not complied with the requirement that it construct a terminal that included storage tanks by the use of which tank strappings and shore tank samples might be taken to determine the quantity and quality of the product delivered to the buyer. Varibus, the Texas court held, "was not required by the contract to accept the product from a pipeline, rather than from shore tanks; it was entitled to have the quantity and quality of the product determined before the product was received into its barges." Id. at 160. Thus, the court concluded that Varibus "properly exercised its right to cancel the contract by reason of South Hampton's failure to complete the terminal by January 1, 1976." Id. Accordingly, the court reversed the verdict for South Hampton that the trial court had directed and rendered judgment for Varibus.
 
 
 28
 South Hampton advances several reasons why the Varibus decision does not require us to reach a similar conclusion regarding Stinnes's cancellation of the contracts. First, it seeks to distinguish Varibus on a factual basis.
 
 
 29
 There were a few differences between the Varibus contracts and the Stinnes contracts. One lay in the respective versions of the "term" clause, Sec. 3.01, of each contract. The Varibus contract gave the buyer the right of cancellation as of August 1, 1975, if the seller had failed to complete the terminal. The seller, however, had an option to provide product of equal quantity and quality from an alternative source at a price to be adjusted to account for transportation costs. But if the terminal were not completed by January 1, 1976, the buyer had the right to cancel the contract finally; and there was no provision for an alternative-source option after that date. The Stinnes contract, by contrast, merely set August 1 as the expected date of first delivery, but provided an alternative source option if the terminal were not finished by January 1. South Hampton argues that, because the Stinnes contract contemplated delivery of product for at least six full months before it required the terminal to be completed, the importance of a complete terminal and the meaning of that term are "considerably less certain in this case than in Varibus." By this attempt to distinguish Varibus, South Hampton also seeks to resurrect its pre-Varibus argument: that its failure to construct shore tankage facilities by January 1 did not amount to a failure to complete the terminal. South Hampton argues that under the "Facilities" clause, Sec. 1.04, shore tankage facilities were a "separate entity," not an integral part of the terminal envisioned by the parties, because that clause refers to "seller's terminal and tankage ...."
 
 
 30
 In concluding that the word "Terminal" was not ambiguous, however, the Varibus court did not look to Sec. 3.01 of the contract but to Sec. 1.04. There were differences between those provisions of the respective contracts too, but not significant ones.[3] Despite South Hampton's efforts to distinguish the terms of the Varibus contract from those of the Stinnes contracts, the key similarities predominate. As the Texas court concluded, shore tankage was a necessary element of a complete terminal for important functional reasons: measurement, quality control, and risk of loss are all better managed from tanks than from pipes or barges. Those considerations are identical in the two seller-buyer relationships.
 
 
 31
 South Hampton next argues that, even if the two sets of contracts are indistinguishable, no binding force attaches to the Varibus court's interpretation of the term "Terminal." Because the question of what meaning a court should attribute to the words of a contract is a question of fact, and not one of law, "[t]he fact that specific words in a contract, even a standardized contract such as an insurance policy, have once been given a meaning by a court in a litigation between A and B should never be held to be conclusive in subsequent litigation between C and D or between A and C," South Hampton contends, quoting Corbin on Contracts.[4] A later Texas court would not be bound by the Varibus court's interpretation of the word "Terminal," nor are we.[5] Nevertheless, as Corbin goes on to note in the same discussion, the prior interpretation "is an important factor; but the other relevant factors may be different." We regard the Varibus court's conclusions as persuasive authority, and absent some indication that a later Texas court would do otherwise, we adopt them as our own in this case.
 
 
 32
 There was a single substantive difference between the Varibus contract and the Stinnes contracts: Varibus had an absolute cancellation right if the terminal were not completed by the deadline; under the Stinnes contract, South Hampton had the option of tendering product from an alternative source. This option, however, does not alter the clarity of the termination clause. Neither does the fact that deliveries under the Stinnes contracts began eight months before the estimated date of terminal completion alter the meaning of that clause. What the buyer was willing to accept as a temporary expedient does not alter what it had the contractual right to require for a continuing ten-year relationship.
 
 
 33
 One consideration remains under this issue. The meaning of a contractual term is usually a question of fact, but meaning "may be made so clear by the evidence that a jury's verdict to the contrary would be set aside."[6] If a written contract containing an express merger clause is "clear and unambiguous and not subject to more than one interpretation" it need not be opened to judicial interpretation.[7] In making its determination, the Varibus court of course applied the Texas rules for granting a directed verdict and judgment notwithstanding the verdict. Under these rules, a court asks, in evaluating a motion for a directed verdict, "whether there is any evidence of probative force" to raise the factual issues presented;[8] to uphold a judgment notwithstanding the verdict, a court must determine "that there is no evidence upon which the jury could have made the findings relied upon."[9] The standard for directing a verdict being a procedural matter, we apply federal, not state, rules even in diversity cases; and the applicable standard in this circuit is set forth in Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc): If, considering all the evidence, the facts and inferences point so strongly and overwhelmingly in one direction that reasonable persons could not arrive at a contrary verdict, the motion should be granted. The Texas Court of Appeals has determined that there is no evidence that the word "Terminal" is ambiguous in a contract using the word in a context almost identical to that in the Stinnes instruments. Under Texas practice, the state Supreme Court's refusal "no reversible error" to grant an application for a writ of error signifies that the Supreme Court has considered the substance of the opinion and approves the result although it neither approves nor disapproves the specific language of the Court of Civil Appeals.[10] We are convinced that a Texas court, faced with substantially similar facts as we are in the present case, would reach the same conclusion. Our confidence is bolstered by the fact that federal procedural law requires us to apply a less stringent standard for taking a question from a jury.
 
 B. South Hampton's "Out-turn" Arguments
 
 34
 South Hampton contends that, whatever the Stinnes contract may originally have required, the parties reached an understanding in early December that all future deliveries of product would be on an "out-turn" basis; i.e., that Stinnes would pay only for the amount of product actually delivered to its tanks, instead of the amount pumped out of South Hampton's storage facilities as the contracts required. This argument is advanced as a basis for several different theories in support of the thesis that Stinnes wrongfully cancelled the contracts.
 
 1. Waiver
 
 35
 South Hampton's first theory is that this out-turn agreement modified the "Terminal" requirements of the contract. It contends that the parties intended to substitute measurement at the place of final delivery (out-turn) for preshipment measurement in tanks at the terminal.
 
 
 36
 Standing squarely in the path of this argument is the contract's no-oral-modification clause, which bars proof of any such change. That clause provides that the contract "may not be changed or terminated orally and no attempted change, termination or waiver of any of the provisions hereof shall be binding unless it is in writing, signed by the parties hereto ...." Under the Texas version of the Uniform Commercial Code, "[a] signed agreement which excludes modification or recission except by a signed writing cannot be otherwise modified or rescinded ...." Texas Bus. & Comm.Code Ann. Sec. 2.209(b). Hence no-oral-modification clauses are binding in Texas.[11]
 
 
 37
 South Hampton attempts to side-step that clause by arguing that the out-turn agreement was a waiver, not a modification, of the contract term. It argues that the provision for measurement of product at storage tanks was for its benefit, not Stinnes's. Out-turn measurement, South Hampton explains, shifts the risk of loss, shrinkage, or contamination in favor of the buyer because measurement is not performed until product reaches the point of final delivery. South Hampton thus attempts to assert waiver as a sword rather than as a shield, contending that it was entitled to waive a contract provision so patently intended to operate for its own benefit.
 
 
 38
 The contract language refutes this argument. Texas law does distinguish between modification and waiver; its commercial code provides that "[a]lthough an attempt at modification or recission does not satisfy the requirements of subsection (b) [quoted above] or (c) [applying the statute of frauds to contracts that, as modified, fall within its ambit] it can operate as a waiver." Texas Bus. & Comm.Code Ann. Sec. 2.209(d). A waiver may be express or implied.[12] But recitation of these general principles does not carry the day for South Hampton. First, the no-oral-modification clause itself anticipated the assertion of waiver by expressly including oral "waiver" among its proscriptions. It does not distinguish between waiver of favorable and burdensome provisions. And the requirement sought to be waived--shore tank facilities--is expressly and, as we have held, unambiguously provided for in the "Terminal" clause. Further, the contract expressly provided that "time was of the essence." Texas courts have held that alleged oral "waivers" of express contract terms specifying place of payment, in contracts containing no-oral-modification clauses, constitute "modifications" under Sec. 2.209(b) and are barred by such clauses because not reduced to writing.[13] Moreover, the Varibus court rejected an identical argument for the same reason: "This theory, if accepted, would amount to a unilateral modification of the contract in violation of [the no-oral-modification clause] of the contract." 623 S.W.2d at 160.
 
 
 39
 Second, South Hampton's theory reaches too far. Although there is evidence in the record to support its contention that out-turn measurement benefitted Stinnes, there is also evidence to the contrary. Stinnes presented evidence showing that measurement, both for quality and quantity, is more accurately made from shore tank strappings and samples. The detailed provisions contained in clause 1.05 ("Measurement, Inspection, and Effect of Acceptance") indicates that this additional precision is more than incremental. South Hampton suggests that these functions could have been performed as well as Stinnes's storage facilities. The contract, however, provided that "title to, and risk of loss, and liability for, all Product delivered hereunder" passed to Stinnes as the product moved "through the flange connecting Buyer's vessel to Seller's Terminal loading line ... or other mutually agreeable place of delivery." South Hampton has not directed our attention to any evidence in the voluminous record showing that it agreed to assume responsibility for all shrinkage, loss, or contamination during product movement. Following the Texas courts' lead in Dave Summers Realtors, Inc. and in Varibus, we regard the alleged waiver in this case as an attempt to modify the contract orally and hold that it is rendered a nullity by the unambiguous terms of the no-oral-modification clause.[14]
 
 2. Alternative Source
 
 40
 As mentioned above, South Hampton had the option to cure its nonperformance of the Stinnes contracts' "Terminal" provisions by offering an alternative source of supply. This option was not available when Varibus cancelled its contracts. South Hampton argues that this difference requires a different result in the present case. Because we have concluded that the word "Terminal" is unambiguous, and its requirements have not been waived, South Hampton may prevail only if it satisfied the alternative source provisions of the contracts.
 
 
 41
 South Hampton contends, somewhat inconsistently with its waiver theory, that the out-turn agreement satisfied the alternative-source option.[15] We conclude that South Hampton failed properly to exercise its option, both in form and substance.
 
 
 42
 Stinnes urges that "[t]he acceptance of an option, to be effectual, must be unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation, and according to the terms and conditions of the option," quoting Vratis v. Baxter, 315 S.W.2d 331, 337 (Tex.Civ.App.1958), writ ref. n.r.e. (quoting 91 C.J.S. Vendor and Purchaser Sec. 10, p. 853). We do not agree that the Vratis standard applies to this case. Vratis concerned the sale of a radio station, not a contract for sale of goods under the U.C.C., as does the present case.
 
 
 43
 "An option is a contract in which the offeror is bound to hold open an offer for a specified period of time." Smith & Robertson, et al., Business Law: Uniform Commercial Code 136 (5th ed. 1982). Accordingly, we turn to the U.C.C. provision on offer and acceptance, which provides: "Unless otherwise unambiguously indicated by the language or circumstances (1) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Texas Bus. & Comm.Code Ann. Sec. 2.206(a)(1). The contracts do not provide for any particular manner of acceptance or exercise of the option. South Hampton did not articulate its intention to exercise the option, but it contends that its conduct manifested such an intention. Although the Code implicitly permits acceptance by performance,[16] South Hampton made neither proffer of performance nor exercise of its option in a manner "reasonable in the circumstances." Stinnes had substantial cause to question whether South Hampton intended the post-January 1 deliveries to invoke the alternative-source option.[17] Stinnes therefore took the most sensible course: it asked South Hampton. When confronted directly with the simple question whether it was exercising its option, however, South Hampton refused to reply. Silence in response to a direct inquiry, made necessary by doubtful circumstances that South Hampton itself created, hardly comports with even a generous reading of the word "reasonable."
 
 
 44
 Even had South Hampton communicated its intentions in a reasonable manner, the source it offered would not measure up to contractual standards. The only alternatives it offered were the barges at the Neches River slip or the incomplete terminal. The option clause did not specify criteria for the alternative source. Section 1.01, however, mandated that Buyer and Seller were to perform their respective obligations "at Seller's Terminal, or elsewhere, in accordance with the terms of the contract." Reading the contract as a whole,[18] we conclude that it unambiguously required South Hampton substantially to meet the measurement and inspection obligations, even if it were to deliver product from an alternative source. The parties made completion of a terminal that allowed satisfaction of those obligations, by January 1, 1976, so critical that its failure--for any reason whatsoever, including force majeure--authorized cancellation of the contracts. Although a provision plainly intended to preserve the deal in the face of adversity might reasonably be expected to comtemplate less-than-perfect performance, it is not a carte blanche to ignore major contractual obligations. Under South Hampton's argument, it might continue to supply produce from barges floating in the Neches River for the entire ten-year term of the contract.
 
 
 45
 The contractual terms expressly required tankage, with facilities for accurate measurement of product. A facility that itself did not satisfy the contract could not either in common sense or law be considered an adequate alternative.
 
 
 46
 South Hampton argues that its volume of out-turn deliveries evidence the commercial reasonableness of that practice. South Hampton did deliver 700,000 barrels of oil to purchasers from the incomplete terminal, approximately 80,000 to Stinnes. These deliveries demonstrate that the pipeline functioned to deliver oil; they do not demonstrate that the terminal was complete or that this method of delivery satisfied the contract requirements. The terms under which the buyers of the other 620,000 barrels chose to accept delivery are irrelevant to interpretation of the Stinnes contracts. And, as South Hampton concedes, the 80,000-barrel transaction with Stinnes was not a sale covered by the contract. It was instead a spot sale, at a reduced price, made for the sole benefit of United, with Stinnes waiving its 42cents per barrel profit margin.[19]
 
 IV. FRAUD
 
 47
 The district court dismissed Stinnes's counterclaim that South Hampton made false representations in negotiating the contracts. Under Texas law, actionable fraud requires proof that: (1) a material misrepresentation was made; (2) the representation was in fact false; (3) the representation was known to be false when made or was made recklessly without knowledge as to its truth and as a positive assertion; (4) the representation was made with the intention that it be acted on by the other party; (5) that party did act in reliance on the representation; and (6) injury resulted.[20] There was sufficient evidence in support of each of these elements to send the claim to the jury.
 
 
 48
 As set forth above, the contracts contained a formula by which the price of the oil was to be determined from time to time. This formula was based on the cost to South Hampton of crude oil and "other feedstocks to the refinery." "Other feedstocks" cost less than crude oil and, when included in the price computation, reduce the cost of both diesel and heavy oil and produce a lower price for each. Throughout the trial, Stinnes contended that the phrase "and other feedstocks to the refinery" meant all feedstocks purchased by South Hampton regardless what their ultimate use would be. South Hampton contended that the phrase was intended to include only those feedstocks that were used to produce heavy fuel oil or diesel and it did not include the cost of "other feedstocks" in computing the price.
 
 
 49
 The contract also included an example of computation, leading to the price of $10.04, which is referred to in Part I of this opinion. Stinnes adduced evidence that this example set a benchmark to be used for verification of the actual price to be charged before the contracts were executed and for auditing during their operation.
 
 
 50
 There was evidence that the parties intended the example to be accurate and that its terms were a major factor in Stinnes' decision to obligate itself to a ten-year contract.[21] There was also evidence that South Hampton had intended to exclude the cost of feedstocks not used to produce diesel and heavy oil but knew that Stinnes thought they would be included and that, during negotiations, South Hampton knowingly understated both the $10.04 price in the example and the $8.19 crude oil component and did not disclose this understatement to Stinnes. The district court nonetheless directed a verdict for South Hampton on this claim.
 
 
 51
 South Hampton first responds that the evidence does not prove that it made a promise with the intention not to perform,[22] and contends that the record, when read as a whole, shows at most a failure of communication concerning the meaning of the language which was to be included in the contract. Moreover, it disputes that Stinnes justifiably relied on any representation made by it, pointing to Stinnes's right to make an audit and the audit it made in December, 1975. Stinnes's right to make an audit, however, does not negate the possibility of fraud; it merely casts doubt on whether it in fact relied on South Hampton's alleged misrepresentation. On this element of fraud, as on the others, South Hampton has demonstrated the existence of a factual dispute. But the existence of a factual dispute is what creates a jury issue unless the evidence is so one-sided that a reasonable juror could not credit any other interpretation. South Hampton's contentions are all supported by the record, and they may well satisfy the trier of fact. They are not, however, established so firmly that a reasonable jury might not decide to the contrary.
 
 
 52
 South Hampton further argues that Stinnes's claims for lost profits and overpricing do not describe actionable injury; for lost profits are not recoverable as damages for fraud and any overcharges were passed on to United under Stinnes's cost-plus contracts. South Hampton's first argument ignores Texas law. The U.C.C. provides that "[r]emedies for material misrepresentation or fraud include all remedies available under this chapter for non-fraudulent breach." Texas Bus. & Comm. Code Ann. Sec. 2.721. Those remedies include both recission and consequential damages. See Id. at Sec. 2.715(b). In general, lost profits are "consequential damages" as contemplated by this subsection.[23]
 
 
 53
 South Hampton quotes Collins v. McCombs, 511 S.W.2d 745 (Tex.Civ.App.1974), writ ref. n.r.e., as support for its assertion that lost profits are not recoverable by Stinnes: "[I]t has been settled that ... the measure of damages for fraud and deceit is not what the plaintiff might have gained, had the representation been true, but what he has lost." Id. at 747. Viewed in context, it is obvious that the quoted language from Collins is simply not apposite. It appears in the court's analysis of the question whether the plaintiff's suit was an action sounding in tort, or "an indirect attempt to recover for the breach of an unenforceable oral promise," which would be barred by the statute of frauds. Id. The action was not brought under the U.C.C. for lost profits as consequential damages.
 
 
 54
 And South Hampton's second argument simply creates another factual question: whether Stinnes suffered any direct loss, or was able to pass all overcharges onto United by way of mitigation.
 
 
 55
 Pretermitting the correctness of the directed verdict, South Hampton contends that the jury's answer to Interrogatory 2 is a specific fact finding that South Hampton's interpretation of the pricing provision was correct, and that Stinnes's interpretation was not. That interrogatory asked the jury whether South Hampton had breached the contract by overpricing. The jury answered, "No." The thrust of South Hampton's argument is that the jury's verdict precludes a finding that South Hampton misrepresented the pricing provision to Stinnes.
 
 
 56
 In its charge to the jury, the district court outlined both parties' competing interpretations of "other feedstocks" and instructed that the jury's answer should depend upon which one it believed. The court went on, however, to instruct the jury that, if it found "South Hampton acted in good faith, [its] answer would be 'No'." Later in its charge, the court told the jury "that no fraud exists as a matter of law, in this lawsuit." It is unclear from the context of these remarks whether the court was referring solely to United's deceptive-trade-practices claim, which it mentioned immediately before the quoted passage, or to all fraud claims, including Stinnes's claim against South Hampton. The court's language easily bears with the latter interpretation, which, if considered by the jury in evaluating the good-faith charge for special interrogatory No. 2, might have led the jury to understand a negative answer was required. Viewing the charge as a whole, as we must,[24] we cannot conclude that the jury, if properly instructed on the element of fraud as applied to this case, would have reached the same result.
 
 V. UNITED'S CLAIMS
 
 57
 The jury found that Stinnes had agreed to hold United harmless from any damages sustained by it as a result of taking products under the contracts with Stinnes, and assessed this damage at $149,320.69. The hold-harmless claim rested solely on testimony concerning a verbal agreement. There was other testimony to the contrary and Stinnes sets forth reasons to question the credibility of the United executive whose testimony furnished the principal evidence of that agreement. That testimony did not evidence a categorical commitment to make good any loss in cash. But the credibility of the witness in the face of contradictory testimony and the inferences that might reasonably be drawn from the statements made were matters for the jury.
 
 
 58
 In addition to assailing the credibility of the testimony, Stinnes contends both that the alleged oral statements were too vague to create a binding obligation and that in any event United, by cancelling its contracts in January, failed to perform its end of the alleged contract. Neither argument is persuasive. Although some agreements may, under Texas law, be too amorphous to be enforceable,[25] a contract is sufficiently definite if a court is able to determine the respective legal obligations of the parties.[26] "The provisions of the contract which may at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implication of facts." Estate of Griffin v. Sumner, 604 S.W.2d 221, 229 (Tex.Civ.App.1980), writ ref. n.r.e.[27] United claimed losses arising out of mismeasurement and overpricing. The testimony evidencing the formation of the alleged hold-harmless contract referred generally to those losses and suggested that the parties understood the references. Stinnes has had no difficulty determining its own losses from mismeasurement and overpricing, and has offered no reason why we should take a different view of United's position.
 
 
 59
 A promise to forego assertion of a colorable claim for breach of contract obviously inures to the promisor's detriment, and in this case to the promisee's benefit; therefore, there is sufficient consideration to support enforcement of a contract.[28] Continued performance despite substandard measurement and pricing conditions constituted United's consideration for Stinnes's promise of indemnity.
 
 
 60
 United did thereafter seek concessions and ultimately terminated its contract. The jury might properly have inferred that United was not obliged to accept noncomplying delivery for the entire ten-year term, and that Stinnes had the benefit of such continued purchases as United chose to make. Stinnes made a profit on each sale, and hoped, it is apparent, to work out matters in such fashion as to benefit by the full term of the contract. Whether United's continued negotiations and ultimate cancellation of the contract negate the existence of the hold-harmless agreement was for the jury to determine; those circumstances do not necessarily betray a failure of consideration for Stinnes' promise.
 
 
 61
 United also contends that, because Stinnes subsequently refused to reimburse United for its losses, the hold-harmless promise was a false or deceptive act or practice giving rise to a cause of action for treble damages and attorney's fees under the Texas Deceptive Trade Practice and Consumer Protection Act. Tex.Bus. & Comm.Code Secs. 17.46, 17.50. The district court properly directed a verdict against United on this claim. Those provisions of the Act protect only consumers.[29] At the time of the alleged promise,[30] insofar as is here relevant, it defined "consumer" as a "corporation who ... acquires by purchase ... any goods," and goods as "tangible chattels ... purchased ... for use." Tex.Bus. & Comm.Code Sec. 17.45. United was not a consumer, as thus defined, for it did not purchase oil not for use but for resale.[31] Moreover, United has not directed our attention to any evidence in the record of any "false, misleading, or deceptive" acts by Stinnes. The mere insistence on litigation to determine one's obligations hardly constitutes such a practice. Stinnes's denial of the contract, although insufficient to earn a directed verdict, was not patently frivolous.
 
 VI. UNFAIR TRIAL
 
 62
 Stinnes raises numerous points of error concerning the conduct of the trial. Only one merits discussion. During the trial, opposing counsel made various references to Stinnes's German ownership, and contrasted South Hampton's and the jurors' local roots with Stinnes's German and New York ties. Although Stinnes has now prevailed in its appeal against South Hampton, our disposition of United's hold-harmless claim keeps this issue from becoming moot.
 
 
 63
 Although counsel's arguments to the jury contained irrelevant and potentially prejudicial comments, the trial court's refusal to grant a new trial was not an abuse of discretion under the particular circumstances we now review.[32] We apply this standard because the trial judge is in the best position to evaluate the impact on the jury of the attorney's conduct, and to determine the most effective response to ensure a fair trial.[33]
 
 
 64
 The objectionable comments by United's attorney did appeal blatantly to ethnic and regional prejudices.[34] But the court cautioned the jury to disregard remarks concerning Stinnes's corporate status as well as its foreign parentage; and under the facts of this case, we conclude that the warning was sufficient to smother the inflammatory effect of these comments.[35] Such remarks are, however, not only improper but reflect disregard by counsel of his duty to the court and to the adversary system which supposes a fair contest, not under-handed blows.
 
 VII.
 
 65
 For these reasons we: (1) VACATE judgment in favor of South Hampton, and REMAND for entry of judgment in favor of Stinnes, on South Hampton's breach of contract claim; (2) REVERSE the directed verdict in favor of South Hampton on Stinnes's fraud claim and REMAND the case for a new trial on this issue alone; (3) AFFIRM the judgment in favor of United and against Stinnes for $149,320.69; and (4) AFFIRM the verdict rejecting United's deceptive trade practices claim.
 
 
 
 [1]
 Christopher v. Safeway Stores, Inc., 644 F.2d 467, 471 (5th Cir.1981); R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex.1980); Martin v. Schneider, 622 S.W.2d 620, 622 (Tex.Civ.App.1981) writ ref. n.r.e.; see generally, 14 Texas Jur.3d Sec. 375 at 630-31 (1981)
 
 
 [2]
 R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., supra at 518-19; Alba Tool and Supply Co., Inc. v. Industrial Contractors, 585 S.W.2d 662, 664 (Tex.1979)
 
 
 [3]
 The Varibus contract read: "SELLER will construct, or cause to be constructed, SELLER'S Terminal and tankage. The combined capacity of such tankage at SELLER'S Terminal and refinery shall include heated storage capacity ...." The analogous provision from the Stinnes contract provided: "SELLER will construct, or cause to be constructed, "SELLER'S Terminal and tankage at the Terminal and Refinery which shall include ...." Both sets of contracts contained provisions for shore tank samples and strappings. If anything, the Stinnes contract appears more clearly to have required tankage at the terminal, as well as at the refinery, in Sec. 1.04
 
 
 [4]
 3 Corbin on Contracts Sec. 554, at 219 and n. 60
 
 
 [5]
 Texas courts have repeatedly declared that the question of whether a contract is ambiguous is one of law for determination by the court. See, e.g., R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., supra at 518-19; Aztec Services, Inc. v. Quintana-Howell Joint Venture, 632 S.W.2d 160, 162 (Tex.App.1982); National Living Centers, Inc. v. Cities Royalty Corp., 619 S.W.2d 422, 424 (Tex.Civ.App.1981); D.C. Edwards & Co. v. Fisher, 610 S.W.2d 546, 549, writ ref. n.r.e. (Tex.Civ.App.1980); First National Bank in Dallas v. Kinabrew, 589 S.W.2d 137, 146 (Tex.Civ.App.1979), writ ref. n.r.e. See also Christopher v. Safeway Stores, Inc., 644 F.2d 467 (5th Cir.1981). We understand these cases to mean that the determination of ambiguity, like other fact questions, will sometimes be a question to be answered by the judge and not the jury. In that sense, as Corbin recognizes, the question is in effect one of law. See 3 Corbin, supra, Sec. 554 at 220. The determination, however, does not become imbued with stare decisis effect just because a judge made it
 
 
 [6]
 3 Corbin on Contracts Sec. 554 at 222-25. See supra note 5
 
 
 [7]
 National Surety Corp. v. Western Fire & Indemnity Co., 318 F.2d 379, 387 (5th Cir.1963)
 
 
 [8]
 Henderson v. Travelers Ins. Co., 544 S.W.2d 649, 650 (Tex.1976)
 
 
 [9]
 Douglass v. Panama, Inc., 504 S.W.2d 776, 777 (Tex.1974)
 
 
 [10]
 Burchfield v. Markham, 156 Tex. 329, 294 S.W.2d 795, 798 (1956), cert. denied, 353 U.S. 988, 77 S.Ct. 1284, 1 L.Ed.2d 1143 (1957); Rock Island Ind. School Dist. No. 907 v. County Bd., 423 S.W.2d 665, 669 (Ct.Civ.App.1968)
 
 
 [11]
 Cf. Texas Construction Associates, Inc. v. Balli, 558 S.W.2d 513, 521 (Tex.Civ.App.1977) (construction contract); D.H. Overmeyer Co. v. Harbison, 453 S.W.2d 368, 370 (Tex.Civ.App.1970) (same)
 
 
 [12]
 Laredo Hides Co., Inc. v. H & H Meat Products Co., Inc., 513 S.W.2d 210 (Tex.Civ.App.1974), writ ref. n.r.e.; Texas Construction Associates, Inc. v. Balli, supra at 521
 
 
 [13]
 Dave Summers Realtors, Inc. v. Astro Leasing, Inc., 603 S.W.2d 301, 302 (Tex.Civ.App.1980). Texas law permits a contract to be modified by subsequent oral agreement, notwithstanding the inclusion of a no-oral-modification clause, if the contract is not required by law to be in writing to be enforceable. See, e.g., Hyatt Cheek Builders v. Board of Regents, 607 S.W.2d 258, 265 (Tex.Civ.App.1980). The South Hampton-Stinnes contracts, however, are for the sale of goods, valued at well over $500, and therefore must be in writing to be enforceable. Tex.Bus. & Comm.Code Ann. Sec. 2.201(a)
 
 
 [14]
 We note that South Hampton, in its offensive use of waiver theory, has taken a somewhat novel position. It insists that it, not Stinnes, has waived the shore tankage requirement. Consequently we are not called upon to decide if Stinnes's acceptance of product delivered on an out-turn basis constitutes a waiver of the shore tank requirement. Similarly, South Hampton has not argued that Stinnes' actions could be construed as a ratification of any modification. As we have noted above, however, Stinnes's toleration of the "temporary expedient" of accepting product on an out-turn basis hardly amounts to acquiescence in the revision of an important contract term
 
 
 [15]
 South Hampton's position on this issue is unclear. In its briefs, it seems to argue that out-turn deliveries invoked its option to provide product at an alternative source. At oral argument, however, counsel conceded that pre-January deliveries did not involve the alternative-source option because South Hampton was not then required to have completed the terminal. Counsel further conceded that post-cancellation deliveries were really "spot sales," transacted outside the contract. It is conceivable that deliveries made between January 1 and the cancellation date fell within the alternative-source provision. In the light of our conclusion, however, we need not speculate further on the basis for South Hampton's theory
 
 
 [16]
 "Where the beginning of a requested performance is a reasonable mode of acceptance, an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed." Texas Bus. & Comm.Code Ann. Sec. 2.206(b)
 
 
 [17]
 See supra note 15 and accompanying text
 
 
 [18]
 Church's Fried Chicken, Inc. v. Jim Dandy, 608 S.W.2d 242, 244 (Tex.Civ.App.1980)
 
 
 [19]
 Our disposition of the breach issue in favor of Stinnes moots the question raised by its contention that, because the South Hampton-Stinnes and Stinnes-United contracts constitute one transaction, the real deal was between South Hampton and United, with Stinnes in the role of an "accommodating party" and therefore entitled to indemnity from United for its liability to South Hampton. For the same reason, we need not address the arguments raised by the parties concerning the proper measure of damages suffered by South Hampton
 
 
 [20]
 Stone v. Lawyers Title Insurance Corp., 554 S.W.2d 183, 185 (Tex.1977); Oilwell Division, U.S. Steel Corp. v. Fryer, 493 S.W.2d 487, 491 (Tex.1973)
 
 
 [21]
 See Neuhaus v. Kain, 557 S.W.2d 125, 136 (Tex.Civ.App.1977), writ ref. n.r.e. ("To avoid a contract for fraud, the fraudulent misrepresentation must have been relied upon to the extent that it was a controlling factor in inducing the making of the contract, and without which the contract would not have been made.")
 
 
 [22]
 South Hampton characterizes Stinnes's claim as based on South Hampton's alleged failure to perform a promise, made with an intent not to perform. Such a claim requires proof of present intent not to perform a future promise. Foster v. Reed, 623 S.W.2d 494, 495-96 (Tex.Civ.App.1981)
 
 
 [23]
 Dura-Wood Treating Co. v. Century Forest Industries, Inc., 675 F.2d 745, 754 (5th Cir.1982), cert. denied, 459 U.S. 865, 103 S.Ct. 144, 74 L.Ed.2d 122, appeal after remand 694 F.2d 112 (1983); General Supply & Equipment Co., Inc. v. Phillips, 490 S.W.2d 913, 920 (Tex.Civ.App.1973), writ ref. n.r.e
 
 
 [24]
 LaCaze v. Olendorff, 526 F.2d 1213, 1220 (5th Cir.1976); Smith v. Hearod, 498 F.2d 663, 665 (5th Cir.1974)
 
 
 [25]
 See, e.g., Moore v. Dilworth, 142 Tex. 538, 179 S.W.2d 940, 942 (1944); Terrell v. Nelson Puett Mortgage Co., 511 S.W.2d 366, 369 (Tex.Civ.App.1974)
 
 
 [26]
 See, e.g., Moore v. Dilworth, supra at 942; Estate of Griffin v. Sumner, 604 S.W.2d 221, 228-29 (Tex.Civ.App.1980), writ ref. n.r.e
 
 
 [27]
 See also Bendalin v. Delgado, 406 S.W.2d 897, 900 (Tex.1966)
 
 
 [28]
 Cf. Coffman v. Meeks, 119 S.W.2d 96, 96-97 (Tex.1938) ("A pending cause of action, or a judgment duly entered by a court, may be the subject of a contract."); see generally 14 Texas Jurisprudence Sec. 110 at 186-87 and n. 91 (3d ed. 1981)
 
 
 [29]
 Trial v. McCoy, 553 S.W.2d 199, 201 (Tex.Civ.App.1977), aff'd after remand, 581 S.W.2d 792, 794 (1979); Russell v. Hartford Casualty Insurance Co., 548 S.W.2d 737, 741 (Tex.Civ.App.1977), writ ref. n.r.e.; Bourland v. State, 528 S.W.2d 350, 358 (Tex.Civ.App.1975), writ ref. n.r.e
 
 
 [30]
 The provisions of the Act which apply to this case are those in effect as of November, 1975, the time the alleged deceptive acts occurred. See Riverside Nat'l Bank v. Lewis, 603 S.W.2d 169, 172 (Tex.1980); Ratcliff v. Trenholm, 596 S.W.2d 645, 648-49 (Tex.Civ.App.1980), writ ref. n.r.e., aff'd after remand, 636 S.W.2d 718 (1982), reversed on other grounds, 646 S.W.2d 927 (Tex.1983)
 
 
 [31]
 See Ratcliff v. Trenholm, supra at 649; Trial v. McCoy, supra at 201, aff'd after remand, 581 S.W.2d at 794
 
 
 [32]
 Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 781-82 (5th Cir.1983)
 
 
 [33]
 Id
 
 
 [34]
 The remarks of United's counsel, in his argument to the jury that Mr. Forticq personally faced tangible losses from the overcharges, provide a good example:
 I think it's that type of philosophy, the philosophy to take off to Germany and leave the problems and the people who are emeshed [sic] in those problems here is the type of philosophy that threatens to push gasoline to two or three dollars a gallon and pass the tab on to you and I [sic]. Now, this case will end very soon. Mr. Bomer will go back to his refinery in Silsbee and hold court on Bomer's Island and Herr Bohlen and his lawyers would hop in their jet and disappear to far-away places, but people like Mr. Pierson and Ed Fourticq are going to be here in Texas and Mr. Fourticq is going to have to go home .... [emphasis supplied]
 The objection of counsel for Stinnes was overruled, and counsel for United continued:
 Mr. Fourticq will have to go home and explain to his wife and two sons about what type of justice he got in the Texas courts and I'm asking you to give him that justice ....
 In his closing argument, counsel for South Hampton also attempted to evoke juror prejudice. Quotation of these remarks would be redundant. Moreover, as to South Hampton, we reverse the result on other grounds.
 
 
 [35]
 LaCaze v. Olendorf, 526 F.2d 1213, 1222-23 (5th Cir.1976). Compare Caldarera v. Eastern Airlines, Inc., supra (plaintiff's counsel accused the defendant airline of callous indifference to loss of human life; court's verdict was on quantum of damages only, and indicated no inflammatory effect) with Crowell-Collier Publishing Co. v. Caldwell, 170 F.2d 941 (5th Cir.1948) (defendant airline accused of having implied that plaintiff Governor favored the lynching of blacks; excessive jury award of punitive damages evidenced prejudicial impact)