United States Court of Appeals,
Fifth Circuit.


Nos. 93-7519, 93-7525.

EXXON CORPORATION, Plaintiff-Appellee, Cross-Appellant,

v.

CROSBY-MISSISSIPPI RESOURCES, LTD., A Mississippi Limited
Partnership, et al., Defendants-Appellants Cross-Appellees.

CROSBY-MISSISSIPPI, Plaintiff-Appellant,

v.

FLORIDA GAS TRANSMISSION COMPANY and Citrus Marketing, Inc.,
Defendants-Appellees.

Jan. 3, 1995.

Appeals from the United States District Court for the Southern
District of Mississippi.

Before POLITZ, Chief Judge, KING and DAVIS, Circuit Judges.

PER CURIAM:

## I. FACTS AND PROCEDURAL HISTORY

Appeal No. 93-7519, involving a dispute between the parties to an operating agreement, and appeal No. 93-7525, involving a dispute between the parties to a gas-purchase contract, were consolidated on appeal because they both involve similar contractual provisions and the question of whether those provisions violate MISS.CODE ANN. § 15-1-5.

### A. APPEAL No. 93-7519

On April 3, 1985, Exxon, as operator, and Crosby Mississippi Resources Limited (CMR), as non-operator, entered into a joint operating agreement for the drilling, completion, and operation of the Oliver Poole 4-1 Oil Well in Amite County, Mississippi.

Pursuant to the operating agreement, Exxon was in charge of "all operations necessary or proper for the development, operation, protection and maintenance" of the joint property. CMR was to share in the costs of drilling the well as well as any royalties derived from the drilling operation.

The parties utilized two standard form contracts to create their joint operating agreement: Form 610 of the American Association of Petroleum Landmen 1982 Model Form Operating Agreement (form 610), and the Council of Petroleum Accountant Societies (COPAS) Accounting Procedure Joint Operations. The COPAS accounting procedure was developed for use in conjunction with form 610. The COPAS accounting procedure "allocates the liabilities and expenditures for which all parties to the Joint Operating Agreement will be responsible and defines the ways in which an Operator will account for the costs incurred in operating an oil well." *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.,* 775 F.Supp. 969, 972 (S.D.Miss.1991).

To recoup CMR's proportionate share of the costs associated with drilling the well, Exxon sent CMR monthly billings, beginning in February 1985, entitled "Joint Operations Statements." Apparently, CMR received a monthly billing statement every month from February 1985 through September 1988, except for February and May of 1985. Exxon also sent CMR a monthly "Status of Account" statement. The Status of Account statements showed the unpaid balance due from the previous month and added current monthly charges reflected on the Joint Operations Statements.

2

CMR never paid Exxon for its share of the expenses associated with the oil well. Finally, on November 6, 1989, Exxon brought suit against CMR and two general partners of CMR, Stewart Gammill, III, and Lynn Crosby Gammill (collectively referred to as CMR), seeking to recover the monies which CMR owed it under the joint operating agreement. CMR answered, denying liability, and asserted several defenses to Exxon's collection efforts. CMR asserted that it was not liable for costs which were the result of Exxon's gross negligence or willful misconduct. CMR further asserted that it was not liable for charges made by Exxon in violation of the operating agreement.

Shortly after the filing of the instant suit, serious discovery disputes arose between the parties. CMR requested information relating to the particulars of Exxon's expenditures in developing the well. Exxon resisted CMR's efforts because it believed that the COPAS accounting procedures foreclosed any argument by CMR that the bills were improper. Specifically, Exxon argued that the following provision of the COPAS accounting procedures established a conclusive presumption concerning the amounts which CMR owed under the joint operating agreement:

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof: provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment

3

(paragraph four).  Likewise, CMR resisted Exxon's discovery requests.  CMR and Exxon both filed motions to compel, and a hearing was held before a magistrate judge.  The magistrate judge ordered CMR to supplement portions of its discovery responses.  However, the magistrate judge held the rest of Exxon's discovery requests "in abeyance" pending resolution of CMR's motion to compel.  Because Exxon's refusal to comply with CMR's discovery requests was based on its assertion that the operating agreement created a conclusive presumption as to the correctness of the billing statements sent CMR, the magistrate judge suggested that the discovery issue raised by CMR's motion to compel could be disposed of by Exxon filing a motion for partial summary judgment. Therefore, the magistrate judge declined to rule on CMR's motion to compel until a summary judgment motion had been filed and ruled on.

Exxon then filed a motion for partial summary judgment based on the conclusive presumption established by paragraph four of the COPAS accounting procedures.  In response to Exxon's motion for partial summary judgment, CMR contended, *inter alia,* that the conclusive presumption violated MISS.CODE ANN. § 15-1-5.  Section 15-1-5 provides:

> The limitations prescribed in this chapter shall not be changed in any way whatsoever by contract between parties, and any change in such limitations made by any contracts [sic] stipulation whatsoever shall be absolutely null and void, the object of this section being to make the period of limitations for the various causes of action the same for all litigants.

Initially, the district court rejected CMR's contention that paragraph four did not apply to a situation when no payments had even been made.  *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.,*

4

775 F.Supp. 969, 974-75 (S.D.Miss.1991). Next, the district court considered whether MISS.CODE ANN. § 15-1-5 rendered paragraph four null and void. *Id.* at 975-76. The district court concluded that paragraph four did not violate Mississippi law because the contract provision created a "condition precedent to be met before challenging the validity of monthly billing statements.... [paragraph four] merely enumerates time-based conditions as predicates to a Non-Operator's right to challenge billing statements, and does not create a statute of limitations in violation of Miss.Code Ann. § 15-1-5." *Id.* at 976.

Following its determination that paragraph four did not violate § 15-1-5, the district court concluded that even though paragraph four created a conclusive presumption, the presumption was not irrebuttable. Specifically, the district court determined that the presumption could be rebutted upon a finding of fraud or bad faith breach of contract. *Id.* The district court, however, concluded that CMR had not propounded any evidence to demonstrate fraud or bad faith breach of contract. *Id.* at 976-77.

The district court then addressed CMR's contention that the conclusive presumption applies only if CMR actually received the bills or statements. According to CMR, it never received billing statements for the months of February and May of 1985; thus, the conclusive presumption could not apply to those bills. While the district court observed that the presumption should apply only if CMR actually received the bills in question, it noted that CMR had received "Status of Account" statements from Exxon which included

5

the billing amounts for February and May and found that the presumption of correctness applied because paragraph four applies to both "bills and statements."

By this point, the district court had concluded "that [paragraph four] obligates a Non-Operator to satisfy bills not excepted to in writing, in the absence of fraud or breach of contract." The district court, however, declined to award Exxon the full amount it had requested pursuant to its motion for partial summary judgment based upon its conclusion that there was a fact issue as to whether CMR's answer and discovery requests had satisfied paragraph four's requirement of a written exception for bills and statements rendered after January 1, 1987. In other words, if CMR's answer constituted a written exception under paragraph four, the conclusive presumption would not apply to billings rendered after January 1, 1987, because CMR would have taken written exception within twenty-four months following the end of the calendar year that those bills were received by CMR. In light of its rulings, the district court entered a partial summary judgment for Exxon in the amount of $428,668.76.

After a bench trial concerning the meaning of the terms "written exception" and "claim for adjustment," the district court concluded that CMR's answer and discovery requests were not written exceptions under paragraph four.[1] Thus, the court concluded that each of the bills and statements sent by Exxon to CMR was

---

[1]CMR does not appeal from the district court's determination that its answer and discovery requests were not "written exceptions" pursuant to paragraph four.

conclusively presumed to be true and that Exxon was entitled to judgment for the entire amount billed.

Following its ruling, the district court instructed the parties to attempt to resolve the amount of interest and attorneys' fees CMR owed Exxon under the joint operating agreement. Not surprisingly, the parties were unable to reach an agreement. The district court considered the remaining issues by way of affidavits and post-trial briefs. The following provision governed the amount of interest owed by CMR under the agreement:

> Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

Exxon argued before the district court that the contract called for compound interest; CMR asserted that the contract called for simple interest. Exxon argued that because it "included in its bills and statements interest for the period prior to the end of December 1986, interest is also covered by the operating agreement's conclusive presumption of correctness." First, the district court concluded that because " "the Joint Operations Statements' are the "bills and statements' contemplated under the COPAS Accounting Procedure and the "Status of Account Statements' are not, and since Exxon set forth its claimed interest only on the "Status of Account Statements,' the conclusive presumption does not apply." Second, based on a COPAS bulletin, which explains the COPAS accounting procedures, the district court determined that the

7

contract provided for the application of simple interest and not compound interest.

On July 19, 1993, the district court entered a final judgment against the defendants jointly and severally in the amount of $781,531.82. The district court's final judgment further provided that $304,041.97 of the judgment would bear interest at the simple interest rate of 12% per annum from July 1, 1993, until paid.

After the entry of final judgment, Exxon and CMR each filed a notice of appeal. On appeal, CMR asserts that the district court erred (1) in determining that paragraph four did not violate MISS.CODE ANN. § 15-1-5, (2) in determining there was no material issue of fact as to whether CMR had rebutted paragraph four's conclusive presumption, (3) in refusing to stay its ruling on Exxon's motion for partial summary judgment pending additional discovery, and (4) in determining that paragraph four's conclusive presumption applied to statements for the months of February and May of 1985 when CMR never received billing statements for those months. Exxon cross-appeals and asserts that the district court erred (1) in determining that paragraph four's conclusive presumption did not apply to the interest which Exxon had charged CMR pursuant to the contract, and (2) in determining that Exxon was entitled to simple interest and not compound interest.

### B. APPEAL NO. 93-7525

This appeal involves the sale of natural gas from the Poplarville gas field in Pearl River County, Mississippi. CMR owns a portion of the mineral interests in the Poplarville Field in

8

Pearl River County, Mississippi.  Exxon also owns a significant interest in a number of the producing wells in the Poplarville Field.  In 1985, Exxon entered into a gas-purchase contract (Exxon contract) with Florida Gas Transmission Company (FGT).  Pursuant to the Exxon contract, FGT was to purchase natural gas from Exxon which was attributable to Exxon's interests in the Poplarville Field.

Following the successful negotiations with Exxon, FGT approached CMR about purchasing CMR's gas in the Poplarville Field.  On August 15, 1986, CMR and FGT executed a contract for FGT to purchase gas from CMR.  The contract between CMR and FGT was actually a copy, with certain modifications, of the Exxon contract.

Article VII of the contract determined the price which FGT was to pay CMR for the gas.  Paragraph 1(a), of Article VII, provided that for the first ninety days following the initial delivery of gas, the total price payable under the contract "inclusive of all taxes and other payments to or on behalf of Seller, shall be two dollars and fifty-five cents ($2.55) per MMBTU."  Following this initial three-month period, paragraph 1(b) provided that for the next twelve months the total price for the gas "inclusive of all taxes and other payments to or on behalf of Seller, shall be the lower of two dollars and seventy-five cents ($2.75) per MMBTU or eighty percent (80%) of the equivalent MMBTU price of No. 6 Fuel Oil."  Paragraph 1(c) provided that the price following the initial three-month period and the subsequent twelve-month period was "inclusive of all taxes and other payments to or on behalf of

Seller, shall be seventy-five percent (75%) of the equivalent MMBTU price of No. 6 Fuel Oil." However, paragraph 1(c) further contained a floor or minimum price provision. The contract provided that the floor price was "the price being paid for gas qualifying for Section 109 of the NGPA."[2]

Once the pricing provisions of paragraph 1(c) took effect, paragraph two of Article VII gave FGT the right to "market out." Essentially, this right to "market out" allowed FGT to set its own price for the gas. However, once FGT exercised its right to "market out," paragraph two provided CMR with the right to accept FGT's proposed price or to cancel the contract.

On March 4, 1987, the pricing provisions of paragraph 1(c) of the contract were to become effective. In order to avoid paragraph 1(c)'s floor provision, FGT proposed, on February 3, 1987, an extension of the current pricing provision until both parties could agree on a new price or until March 31, 1987, whichever was earlier. CMR agreed to FGT's written proposal.

Because the February 3 letter agreement expired on March 31, 1987, FGT, on March 31, 1987, sent another letter proposing a second price extension until May 31, 1987, or until both parties could agree on a new price. CMR agreed to this written proposal by signing and returning the letter agreement.

After the March 31, 1987, letter agreement expired, the parties did not enter into another written modification of the

_____

[2]The parties stipulated that "NGPA" refers to the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.*

10

contract. Therefore, pursuant to the express terms of the contract, paragraph 1(c), with its floor price, governed the price payable. Even though the parties never entered into a formal modification agreement, they did negotiate towards the development of a mutually agreeable price provision.

On June 4, 1987, FGT sent CMR a fax requesting a waiver of the floor provision. Thereafter, about June 9, 1987, FGT sent CMR three duplicate originals of a revised draft of the proposal which FGT had faxed on June 4, 1987. The terms of the proposal, in pertinent part, provided:

> In lieu of FGT exercising its market-out right as set forth in Article VII, Paragraph 2 of said Contract, the parties hereby agree that, for the period commencing June 1, 1987 and thereafter until this agreement is terminated by either party upon prior written notice (i) FGT shall purchase, to the extent that such gas is made available to FGT, 100% of the gas dedicated by [CMR] under said Contract, and (ii) Crosby shall waive the NGPA Sec. 109 floor price set forth in Article VII, Paragraph 1.(c), for as long as this agreement is in effect.

It is undisputed that CMR did not execute and return any of the duplicate originals to FGT.

Even though CMR failed to execute the contract, FGT began performing as if this agreement was in full force. The price which FGT was paying CMR and the price which the express terms of the parties' agreement called for were significantly different. For the period from June 1, 1987, to January 31, 1992, including prejudgment interest, the record suggests that the principal amount of the underpayments amounted to over seven million dollars.

At the end of 1991, FGT assigned its rights under the gas-purchase contract to Citrus Marketing Inc. (Citrus).

Apparently, because Citrus would now be performing under the gas-purchase contract, CMR had its legal counsel review the contract. Finally, in late 1991, CMR claims to have discovered that FGT had been paying it less than the floor price since June 1987. On December 31, 1991, CMR filed suit, seeking to recover the difference between the amount actually paid by FGT and the amount FGT would have paid pursuant to the § 109 floor price. After learning that CMR was now objecting to the price which it had continuously accepted for over four years, Citrus exercised its right to "market out."

Subsequently, CMR filed an amended complaint adding Citrus as a defendant. FGT and Citrus filed an answer and a counterclaim alleging fraud. On February 2 and 3, the district court held a bench trial. The district court initially noted that CMR could not challenge the validity of the amounts paid by FGT "as to which the statements from the defendants to the plaintiff itemizing such purchases were rendered more than two years prior to plaintiff's objecting to the defendants as to the accuracy of such statements." *Crosby-Mississippi Resources v. Florida Gas Transmission Co.,* 815 F.Supp. 977, 979 (S.D.Miss.1993).[3] Specifically, the district court determined that the contract's presumption of accuracy applied to all statements for gas sold prior to November 1989. *Id.* Next, the district court determined that the parties, sometime before June 4, 1987, entered into a verbal agreement, the terms of

[3]The district court found that CMR did not object to FGT's failure to pay the § 109 floor price until December 30, 1991. *Crosby-Mississippi Resources, Co.,* 815 F.Supp. at 979.

12

which were the same as the proposal set forth in the letter dated June 4. *Id.* at 980. The district court further found that Stewart Gammill III knew from June of 1987 forward that CMR was not being paid the § 109 floor price. *Id.* Even though the district court determined that the parties had entered into an oral modification of the contract, it concluded it was unenforceable under MISS.CODE ANN. § 75-2-209 (1971). *Id.* However, the district court then found that "this is a classic case for waiver under subsection (4) of MISS.CODE ANN. § 75-2-209 since there was an attempt at modification or rescission." *Id.* The district court further determined that a stamped notation on the backs of the checks was ineffective to demonstrate that CMR's course of conduct over four and a half years did not constitute a waiver of the § 109 floor price. *Id.* at 981. In sum, the district court concluded that FGT had proven its affirmative defense of waiver under the UCC and that CMR should take nothing.

## II. STANDARDS OF REVIEW

We review the granting of summary judgment de novo, applying the same criteria used by the district court in the first instance. *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994). First, we consult the applicable law to ascertain the material factual issues. *King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992). We then review the evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1272 (5th Cir.1994); *Federal Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1306 (5th Cir.1993),

13

*cert. denied,* --- U.S. ----, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

A district court's findings of fact must be accepted unless clearly erroneous; a district court's conclusions of law are reviewable de novo. *Prudhomme v. Tenneco Oil Co.,* 955 F.2d 390, 392 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 84, 121 L.Ed.2d 48 (1992). The interpretation of an unambiguous contract is a question of law and is therefore subject to our de novo review. *Haber Oil Co. v. Swinehart (In re Haber Oil),* 12 F.3d 426, 443 (5th Cir.1994). The initial question of whether a contract is ambiguous is also a question of law. *Id.*

### III. DISCUSSION

#### A. APPEAL NO. 93-7519

##### 1. *MISS.CODE ANN. § 15-1-5*[4]

Initially, we address the question of whether paragraph four of the COPAS accounting procedures violates MISS.CODE ANN. § 15-1-5. As noted above, § 15-1-5 provides:

The limitations prescribed in this chapter shall not be

---

[4]Although appeal No. 93-7519 was consolidated with appeal No. 93-7525 because they both involved the question of whether the contracts at issue violated § 15-1-5, we need not address whether the contract provision at issue in the latter appeal violated § 15-1-5 because CMR clearly waived enforceability of the floor provision, thus rendering the § 15-1-5 discussion unnecessary. *See* Part B *infra.*

changed in any way whatsoever by contract between parties, and any change in such limitations made by any contracts [sic] stipulation whatsoever shall be absolutely null and void, the object of this section being to make the period of limitations for the various causes of action the same for all litigants.

As we have already stated, CMR contends that paragraph four violates this provision of Mississippi law. Paragraph four bears repeating:

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof: provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.

In finding that paragraph four did not violate MISS.CODE ANN. § 15-1-5, the district court concluded that "contractual conditions precedent that must be met for rights to accrue do not violate Miss.Code Ann. § 15-1-5." *Exxon Corp. v. Crosby-Mississippi Resources Ltd.,* 775 F.Supp. 969, 975 (S.D.Miss.1991). The district court went on to conclude that the provision at question created conditions precedent to be met before challenging the validity of monthly billing statements. *Id.* at 976. In reaching this conclusion, the district court relied on cases in which Mississippi courts had upheld notice provisions in insurance contracts. *Id.* at 975-76.

For example, in *Brander v. Nabors,* the district court held that a provision in a "claims made" medical malpractice insurance policy requiring a claim to be made against the insured within

15

thirty-six months of the policy's termination date did not violate § 15-1-5.  443 F.Supp. 764, 770-72 (N.D.Miss.), *aff'd,* 579 F.2d 888 (5th Cir.1978).  The pertinent provision of the insurance policy at issue in *Brander* provided:

> 5. In the event of
>
> (a) the expiration of this Insurance by reason of nonrenewal, ...
>
> then this Insurance shall extend, subject otherwise to its terms, limitations, exclusions and conditions, to apply to claims made against the Assured during the thirty-six calendar months following immediately upon such expiration or termination *but only for* Malpractice committed or alleged to have been committed between the Retroactive Date [the beginning date of the policy] and such expiration or termination.

*Id.* at 766.

Under the terms of the policy, coverage extended to all acts of malpractice committed by the insured while the policy was in force.  However, the policy limited its coverage to claims made against the insured within thirty-six months of the policy's termination.  In *Brander,* suit was brought against the insured fifty-two months after the policy terminated for malpractice allegedly committed while the policy was in force.  *Id.* at 767. The insurer claimed it was not liable under the policy because no claim was made against the insured within thirty-six months following the termination of the policy.  *Id.*  The insured argued that the policy's thirty-six month notice provision violated § 15-1-5 because it impermissibly shortened the applicable statute of limitations.  *Id.*  The district court determined that the question to be answered in the case was whether "the restrictions as to time

16

articulated in the policy, during which claims must be made against the assured, are valid conditions precedent to the insurer's liability or impermissible attempts to shorten the state's applicable" statute of limitations. *Id.* at 770-71. The district court found that the "policy limitations relating to the time within which a claim must be made against the assured are valid conditions precedent to the insurer's liability and are not violative of § 15-1-5." *Id.* at 772; *see Cox v. Lamar Life Ins. Co.,* 208 Miss. 146, 43 So.2d 884, 886 (1950) (holding that a provision in a life insurance policy which allowed for the waiver of premiums and a monthly income if the insured supplied the insurer with proof of permanent disability by the anniversary date of the policy nearest the insured's sixtieth birthday was a condition precedent to the insurer's liability and therefore not a restriction on the applicable statute of limitations).

CMR argues that cases such as *Brander* are inapplicable to the present issue because the notice provisions in those cases were valid conditions precedent to liability, while the contractual provision in this case limits the time within which a party may act to enforce his rights. As support for its contention that the provision at issue in this case violates Mississippi law, CMR relies on *Dodson v. Western Union Telegraph Co.,* 97 Miss. 104, 52 So. 693 (1910), and *Illinois Central Railroad Co. v. Jordan,* 108 Miss. 140, 66 So. 406 (1914).

In *Dodson,* the plaintiff sued Western Union for its failure to deliver a telegram. 52 So. at 693. Western Union contended that

17

the following provision relieved it of any liability:

> The company will not hold itself liable for errors or delays in transmission or delivery of unrepeated messages, beyond the amount of tolls paid thereon, nor in any case where the claim is not presented in writing within sixty days after the message is filed with the company for transmission.

*Id.* Dodson failed to present his claim within sixty days, and the lower court determined that this failure precluded him from recovering any damages from the company. *Id.* On appeal, the Mississippi Supreme Court noted that it had previously upheld a provision such as this as a valid "condition precedent, with which the claimant must comply or lose his claim, and if he does comply he may sue within the time limited by the statute, and that it is not a limitation but a reasonable regulation." *Id.* The court, however, noted that a recently passed statute, § 3127—predecessor to § 15-1-5—was intended to void contractual provisions which have the effect of shortening the applicable statute of limitations. *Id.* The court concluded that "[a]ll contracts which directly or indirectly have that effect are condemned." *Id.* at 694. On suggestion for rehearing, the court noted that previous cases upholding provisions such as this were, in essence, overruled by the new statute. *Id.*

Likewise, in *Illinois Central Railroad Co. v. Jordan,* the Mississippi Supreme Court determined that a provision in a bill of lading which stated that

> [i]t is further agreed by the shipper that no claim for loss or damage to stock shall be valid against said railroad company unless it shall be made in writing, verified by affidavit, and delivered to the general freight agent of the company at the station from which the stock is shipped, or the agent of the company at the point of destination, within 10

18

days from the time said stock is removed from the cars was invalid as an improper attempt to change the applicable statute of limitations.  66 So. at 406.

Based on *Dodson* and *Jordan,* CMR asserts that the contractual provision at issue is an improper attempt to shorten the applicable statute of limitations.[5]  Certainly, the broad language in *Dodson* and its rejection of previous cases upholding notice provisions as proper conditions precedent would certainly appear to control the instant case.  However, we believe that the full import of *Dodson* and *Jordan* has been limited by subsequent decisions by the

---

[5]CMR also attempts to rely on *Smith v. Orkin Exterminating Co., Inc.,* to support its contention that paragraph four violates Mississippi law.  791 F.Supp. 1137 (S.D.Miss.1990), *aff'd,* 943 F.2d 1314 (5th Cir.1991).  However, we do not find *Smith* to be applicable to this case.  In *Smith,* the court was confronted with the question of whether a contractual limitation of remedies provision was enforceable under Mississippi law.  *Id.* at 1140. The agreement contained a provision which provided for a one year period in which to instigate suit.  *Id.* at 1142.  The plaintiff argued that the provision calling for the instigation of suit within one year was void under Mississippi law.  *Id.*  The agreement further provided that the limitation of remedy provision was "[s]ubject to the general terms and conditions" of the contract.  *Id.*  Because the limitation of remedy provision was "subject" to the allegedly void instigation of suit provision, the plaintiff argued that the limitation of remedy provision was likewise unenforceable.  *Id.*  The district court rejected this argument because it determined it could "easily sever the allegedly unenforceable clause from the remainder of the contract without reforming the substance of the contract." *Id.*  However, the district court did not discuss whether the provision providing for a one year time period to bring suit violated Mississippi law.  Further, the district court's opinion does not indicate whether the plaintiff had violated the provision.  The district simply concluded that even if the provision was invalid under Mississippi law, the limitation of remedy provision was not automatically rendered void.  Thus, because the district court did not discuss the enforceability of the contract's instigation of suit provision, the *Smith* decision is of no help in resolving the issue before this court.

19

Mississippi Supreme Court.

For example, in *Aetna Life Insurance Co. v. Walley,* an insured sued his insurer in an attempt to collect money he had spent in settlement of a malpractice judgment entered against him, as well as money expended in defending the original suit. 174 Miss. 365, 164 So. 16, 16 (1935). The insurer defended the suit on the grounds that the insured had failed to comply with clauses A, B, and C of the contract which provided:

> A. Upon becoming aware of any malpractice, error or mistake, or any allegation of such malpractice, error or mistake, the Assured shall give immediate written notice thereof with the fullest information obtainable at the time to the Company, or its duly authorized agent. If claim is made on account of such malpractice, error or mistake, or allegations thereof, the Assured shall give like notice of such claim, together with full particulars. The Assured shall, at all times, render to the Company all co-operation and assistance in his power.
>
> Report and defense of suits.
>
> B. If suit is brought against the Assured to enforce a claim for damages covered by this policy, he shall immediately forward to the Company every summons or other process as soon as the same shall have been served on him, and the Company will, at its own cost, defend such suit in the name and on behalf of the Assured.
>
> Co-operation of Assured. Expenses.
>
> C. The Assured, whenever requested by the Company, shall aid in securing information and evidence, and the attendance of witnesses, and in prosecuting appeals, but the Assured shall not voluntarily assume any liability or interfere in any negotiations for settlement, or in any legal proceedings, or incur any expense or settle any claim, except at his own cost without the written consent of the Company previously given.

In construing the applicable provisions, the *Walley* court noted that

> [t]he requirements of clauses A, B, and C of the policy conferred a valuable right upon the [insurer], the purpose of

20

which was to enable it to investigate a claim against the appellee covered by the policy; to itself decide whether the claim should be settled without litigation, and, if not, to prepare its defense thereto, and should have been complied with, unless compliance therewith was waived or excused under some pertinent rule of law.

*Walley,* 164 So. at 19. In rejecting the insured's argument that clauses A, B, and C of the contract were void as impermissible restrictions on the applicable statute of limitations, the court stated that the

notice here required in no way affects the time within which suit must be brought on a policy, or within which notice must be given of a liability claimed to have arisen thereunder. The right of the insured to recover on this policy does not arise, if at all, until the termination of a suit against him for malpractice, and the time within which the insured must sue on the policy begins when, but not until, the termination of such a suit.

*Id.* at 19. The court concluded that these "clauses of the policy relate only to things to be done before liability thereon becomes fixed, and when such is the case [ ] Section 2294, Code of 1930, is not violated." *Id.* at 19-20.

In *Western Casualty and Surety Co. v. Honeywell, Inc.,* the Mississippi Supreme Court considered whether the following provision in a payment bond violated Mississippi public policy:

3. No suit or action shall be commenced hereunder by any claimant:

a) Unless claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: the Principal, the Owner, or the Surety above named, within 90 days after such claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or from whom the work or labor was done or performed.

380 So.2d 1385, 1387 (Miss.1980). The payment bond at issue was

21

executed pursuant to Mississippi statutory law which required the general contractor to execute a bond assuring that all persons supplying labor or material would be promptly paid.  *Id.* at 1388. Mississippi statutory law did not address the question of whether the notice provision at issue was a valid provision of the required bond.[6]  Further, the applicable statute of limitations provided that suit must be brought within one year of final settlement of the construction contract.  *Id.* at 1386.

Honeywell, a supplier of a subcontractor, did not have a contract with the prime contractor, and, thus, was required, under the terms of the payment bond, to give written notice before filing an action to collect under the payment bond.  *Id.* at 1387. Honeywell, however, failed to furnish the required notice.  *Id.* Honeywell filed suit against the surety within the applicable statute of limitations for a suit on a bond.  *Id.*  The trial court concluded the ninety-day notice provision was repugnant to Mississippi public policy.  *Id.*

On appeal, the Mississippi Supreme Court determined that the applicable notice provision did not violate public policy.  The precise question on appeal was whether the ninety-day notice provision violated public policy as expressed in the applicable statute of limitation which allowed for suit on the bond "to be commenced [ ] after the complete performance of said contract and

_____

[6]The Mississippi Supreme Court noted that the ninety-day notice provision contained in the bond is a mandatory provision for federal construction contracts.  *Western Casualty and Sur. Co.,* 380 So.2d at 1387.

22

final settlement thereof, and shall be commenced within one year after the performance and final settlement of said contract and not later." *Id.* at 1386. Even though § 15-1-5 was not directly applicable to the case, the court relied on its earlier decision in *Aetna Life Ins. Co. v. Walley,* 164 So. 16 (1935) to conclude that the ninety-day notice provision did not violate public policy. Specifically, the court noted that, "[t]he 90 day notice provision in the payment bond did not limit the time that Honeywell could bring suit under section 31-5-7 [the applicable statute of limitations] but related only to things to be done by Honeywell as a supplier of a sub-contractor before Western Casualty became liable to Honeywell." *Western Casualty and Sur. Co.,* 380 So.2d at 1388. Thus, the court concluded that the ninety-day notice provision was a condition precedent to recovery by Honeywell. *Id.* at 1390.

However, it must be noted that not all notice provisions contained in insurance contracts have been upheld by the Mississippi Supreme Court. In *Latham v. United States Fidelity & Guaranty Co.,* the Mississippi Supreme Court determined that the following provision of a fidelity bond was an impermissible restriction of the applicable statute of limitations:

> No action shall lie against the Underwriter unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this bond, not until ninety days after the required proofs of loss have been filed with the Underwriter, *nor at all unless commenced within one year from the date when the Insured discovers the loss.* If any limitation of time for notice of loss or any legal proceeding herein contained is shorter than that permitted to be fixed by agreement under any statute controlling the construction of this bond, the shortest permissible statutory limitation of

> time shall govern and shall supersede the time limitation
> herein stated.

267 So.2d 895, 896 (Miss.1972) (alteration in original). However, *Latham* is distinguishable from the instant case. In *Latham,* the contractual provision at question required the insured to bring suit within one year of discovery of the loss even if the insured had complied with all other requirements of the contract. It is hard to imagine a provision which would more clearly violate § 15-1-5 than this one.

Sitting in diversity, our quest is to determine how the Mississippi Supreme Court would construe the provision at issue in this appeal. We believe that, presented with the question before us, the Mississippi Supreme Court would determine that paragraph four of the COPAS accounting procedures does not violate § 15-1-5. First, we note that this provision is different from other provisions which the Mississippi Supreme Court has struck down because it does not completely foreclose CMR from bringing suit against Exxon. *E.g., Latham,* 267 So.2d at 896 (striking down a contractual provision which provided that an insurer could not bring suit unless the suit was commenced within one year from when the insurer discovered the loss). Rather, the provision creates an evidentiary presumption, albeit a conclusive one, in favor of Exxon's billing statements upon the non-operator's failure to take exception to those statements within the applicable time period.[7]

---

[7]We further note that paragraph four's requirements are minimal. All the provision requires is that CMR, the non-operator, send Exxon, the operator, a written exception to any bill within two years. In fact, the operating agreement

24

If it is theoretically possible that paragraph four could be interpreted as foreclosing a claim before the applicable statute of limitations has run—a matter we need not decide—this is not such a case. In the instant case, CMR has asserted defenses to Exxon's collection efforts, but no affirmative claims for relief. Specifically, CMR has interposed as an affirmative defense the following: gross negligence, willful misconduct, and failure "to meet the requirements of and satisfy the provisions of the agreement." CMR does not, because it cannot, argue that its right to pursue these affirmative defenses to avoid liability to Exxon is subject to any limitation periods—statutory or otherwise. *See Distribution Servs. Ltd. v. Eddie Parker Interests, Inc.,* 897 F.2d 811, 813 (5th Cir.1990) (noting that a defense is never barred by limitations so long as the plaintiff's main action itself is timely). Thus, paragraph four cannot, in this case, act to terminate CMR's defense to Exxon's suit prematurely. Even though CMR has attempted to couch its defenses to Exxon's collection

---

further protects a non-operator, such as CMR, by granting it the right to conduct an audit of Exxon's accounts and records. The relevant provision provides:

> A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for taking of written exception to and the adjustments of accounts as provided in Paragraph 4 of this Section I.

In essence, the audit provision allows a non-operator to conduct a fishing expedition.

25

efforts as claims for relief, these are really defenses in that they seek to deduct from Exxon's recovery under the contract. Further, even if CMR has asserted claims which were improperly labeled as defenses, those claims were properly dismissed because CMR failed to present any evidence in support, not because paragraph four foreclosed them. *See* Part III.2 *supra.* Therefore, under the facts presented in this case, we cannot say that paragraph four violates Mississippi law as an impermissible limit on any applicable statute of limitations.

## 2. *Attacking the Presumption*

Next, CMR asserts that the district court improperly granted summary judgment for Exxon because there were material issues of fact as to whether CMR could rebut paragraph four's conclusive presumption. The district court determined that the conclusive presumption established by the joint operating agreement could be rebutted upon a showing of fraud or bad faith breach of contract. *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.,* 775 F.Supp. 969, 976-77 (S.D.Miss.1991). However, the district court ultimately granted Exxon's motion for partial summary judgment because CMR did not submit any evidence to demonstrate it would be able to rebut the conclusive presumption. *Id.* The district court further denied CMR's request for additional discovery because it believed CMR wished to conduct a fishing expedition. *Id.*

First, we address CMR's contention that the district court improperly granted Exxon's motion for partial summary judgment because of the existence of material issues of genuine fact. CMR

26

contends that the following allegations, contained in its discovery responses, establish material issues of fact which should have precluded summary judgment: (1) Exxon had failed to pay CMR its share of the proceeds from the sale of production from the well, and (2) Exxon had over-engineered the well by the use of "overly designed and unneeded equipment[8]."

After reviewing the evidence which CMR cites us, we conclude that the district court did not err in granting Exxon summary judgment. Even assuming CMR's contention that Exxon's failure to pay production proceeds would be relevant in rebutting the conclusive presumption, CMR presents no evidence that such money

---

[8]CMR's evidence in this regard is confined to the following response to Exxon's interrogatories:

> Defendants specifically question some expenditures based upon an examination of the drillsite and equipment by J. Terry Owen, petroleum engineer, Jackson, Mississippi, consultant to Defendants, and upon a conversation or conversations had between Mr. Owen and an engineer of Exxon. Mr. Owen's onsite examination led him to believe that the tank battery for the subject well was far more than was needed for this well. Likewise, Mr. Owen is of the opinion that much of the surface equipment such as heater treaters, was overdesigned in the sense that equipment of that design and capacity was not needed for this well. In a conversation with an engineer of Exxon, Mr. Owen determined that Exxon was using heavy walled tubulars of the type normally used when one encounters hydrogen sulphide. The Exxon engineer indicated that it was used because the Exxon research department recommended such. In the opinion of Mr. Owen, and based upon his knowledge of the situation, the use of such tubulars was unnecessary as hydrogen sulphide has not been encountered in wells drilled in the lower Tuscaloosa formation in Mississippi.

CMR has not directed this court to any sworn statement by Mr. Owen in support of these allegations.

27

was owing.  In fact, in its discovery responses, CMR admits that Exxon paid it the only amount which CMR was aware Exxon owed it.[9] We further conclude that the other evidence which CMR proffered to establish a genuine issue of fact is equally unavailing.  *See Martin v. John W. Stone Oil Distrib.,* 819 F.2d 547, 549 (5th Cir.1987) ("Neither the district court nor this court may properly consider hearsay evidence in affidavits and depositions.").

Next, we address CMR's contention that the district court erred in granting summary judgment without allowing it to complete further discovery.  CMR asserts it was unable to establish any of its defenses because the district court granted Exxon summary judgment before it was able to sufficiently conduct discovery and obtain proof for its defenses.  In denying CMR's request, the district court determined it should not delay ruling on Exxon's motion for summary judgment because CMR had not "set forth specific instances of breach of contract, nor do they list the facts that might support a showing of breach of contract.  The Court will not refrain from ruling on [Exxon's] Motion for Partial Summary Judgment simply because [CMR] wish[es] to engage in speculative discovery."  *Exxon Corp.,* 775 F.Supp. at 977.

---

[9]We further note that the district court gave CMR credit for production proceeds which Exxon had withheld.  In its final judgment of July 3, 1993, the district court stated that CMR is "entitled to a credit of $26,895.10 as Defendants' share of production proceeds held by Exxon Corporation for production during the period of February, 1985 through February, 1986."  CMR has not argued on appeal that the amount which the district court offset was incorrect or that the district court failed to offset other withheld production revenues;  rather, CMR argues only that because Exxon wrongfully withheld production revenues, the district court could not grant summary judgment.

28

We review a district court's decision to preclude further discovery prior to granting summary judgment under the abuse of discretion standard. *Wichita Falls Office Assocs. v. Banc One Corp.,* 978 F.2d 915, 918 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 2340, 124 L.Ed.2d 251 (1993). The party moving for a continuance of discovery must establish three general requirements: (1) request extended discovery prior to the district court's ruling on summary judgment, (2) place the district court on notice that further discovery pertaining to the summary judgment is being sought, and (3) demonstrate to the district court how the requested discovery pertains to the pending motion. *Id.* at 919.

Initially, we note that the district court did not err in refusing discovery on matters which were foreclosed by the conclusive presumption established by paragraph four of the operating agreement. Many of CMR's discovery requests relate solely to the appropriateness of Exxon's billing statements. However, because Exxon's charges were deemed established, the district court properly rejected CMR's request to extend discovery to enable it to demonstrate the billings were inappropriate. *Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1417 (5th Cir.1993) (upholding district court's rejection of evidence to dispute the validity of charges which were conclusively established under the parties' operating agreement).

Further, we do not believe the district court abused its discretion in denying CMR's request for additional discovery concerning its remaining defenses. In its reply to Exxon's motion

for partial summary judgment, CMR's attorney attached an affidavit outlining why CMR needed additional discovery to oppose Exxon's motion. In his affidavit, CMR's attorney stated that his "experience [had] led [him] to the conclusion that in an undertaking as complex and expensive as the drilling of an oil well, there is the reasonable probability of errors which would constitute breaches of the [joint operating agreement] by the Operator." We agree with the district court that CMR's request for an extension of discovery was merely a request by CMR to conduct a fishing expedition. Thus, we uphold the district court's denial of CMR's request for additional discovery. *Robbins v. Amoco Prod. Co.,* 952 F.2d 901, 907 (5th Cir.1992) (upholding the district court's denial of a motion for additional discovery because the party's request "contains only the vague assertion that additional discovery is needed"); *Paul Kadair, Inc. v. Sony Corp. of Am.,* 694 F.2d 1017, 1030 (5th Cir.1983) (noting that Rule 56(f) cannot be relied upon to defeat a motion for summary judgment "where the result of a continuance to obtain further information would be wholly speculative").

3. *Does paragraph four's conclusive presumption apply to Exxon's billing statements for February and May 1985*

CMR asserts the district court erred in applying paragraph four's conclusive presumption to amounts which Exxon billed it for February and May 1985. CMR argued below that even if paragraph four's conclusive presumption applied to Exxon's bills, it could not apply to amounts which Exxon had attempted to bill for February and May of 1985 because CMR never received billing statements for

30

those months.  The district court determined that actual receipt of the bill by CMR was required for the presumption of conclusiveness to apply.  *Exxon Corp.,* 775 F.Supp. at 978.  The district court then noted that Exxon also prepared "Status of Account Statements" which reflected the billing amounts for February and May 1985. Because the Status of Account Statements reflected the charges incurred in February and May 1985, the district court determined that paragraph four's conclusive presumption attached to the amounts billed for those months.

The Status of Account Statement which the district court found reflected the charges incurred in February and May 1985 was issued in December 1986.  Our review of the record demonstrates that this Status of Account Statement "reflects" the billing statements for February and May 1985 by including them in the total which CMR owed to Exxon.  In other words, the statements did not specifically set out what the billing amounts for February and May 1985 were.  The parties' joint operating agreement required Exxon to prepare bills for the preceding month which "will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail."  Exxon's Status of Account Statements are not detailed enough to satisfy the joint operating agreement's billing requirements and therefore are not entitled to the presumption of correctness afforded by

31

paragraph four.

### 4. *Exxon's cross-appeal*

On cross-appeal, Exxon asserts that the district court erred in determining that the operating agreement called for simple rather than compound interest. As stated earlier, the relevant contractual provision provides:

> Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

Exxon argued before the district court that the above provision clearly and unambiguously calls for compound interest. The district court, however, determined that the COPAS accounting procedures called for the application of simple interest. In reaching this conclusion, the district court relied on COPAS bulletin No. 5. COPAS bulletins explain the COPAS accounting procedures. Exxon argued that COPAS bulletin No. 5 was irrelevant to the issue before the district court because bulletin No. 13 was the current bulletin at the time the contract at issue was executed. The district court, however, determined that bulletin No. 5 was the applicable bulletin because a COPAS bulletin remains effective until a subsequent bulletin expressly overrules it. Because bulletin No. 13 did not expressly overrule No. 5, the district court looked to that bulletin for guidance. Bulletin No. 5 stated that simple interest should accrue on all unpaid payments.

As further support for its contention that the joint operating

32

agreement provides for compound interest, Exxon relies on *Texon Energy Corp. v. Dow Chem. Co.,* 733 S.W.2d 328 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). In *Texon,* the court interpreted the following provision as clearly and unambiguously providing for compound interest: "If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum." *Id.* at 331. The *Texon* court rejected the argument that the term *unpaid balance* referred to the unpaid *principal* balance because it believed that such a construction rendered the term monthly "totally meaningless." *Id.*

CMR argues that *Texon* is not persuasive authority because Mississippi law requires that a contract specify that interest will be compounded while Texas does not have such a requirement. To support this contention, CMR relies on this court's decision in *Stovall v. Illinois Cent. Gulf R.R.,* 722 F.2d 190 (5th Cir.1984). In *Stovall,* we considered "whether interest awarded by a 1981 judgment was intended to be computed on a simple basis or instead to be compounded annually." *Id.* at 191. We concluded that pre-judgment interest was to be compounded annually and post-judgment interest was to be compounded on a simple basis. *Id.* We concluded that MISS.CODE ANN. § 75-17-1(1), which provided that the legal rate of interest was to be "six percent (6%) per annum, calculated according to the actuarial method," had the "technical meaning that interest be computed at the specified rate, compounded annually." *Id.* at 192. Thus, we upheld the district court's determination that pre-judgment interest should be computed at six

33

percent per annum, compounded annually.  *Id.*

In determining the proper rate of interest for post-judgment interest, we construed MISS.CODE ANN. § 75-17-7, which provided that judgments on accounts " "shall bear interest at the rate of eight percentum (8%) per annum' " as providing for simple interest.  *Id.* In reaching this conclusion, we noted that the general rule is that "when interest is allowable, it is to be computed on a simple rather than compound basis in the absence of express authorization otherwise."  *Id.*

However, even if Mississippi follows the general rule that when interest is allowed it is to be computed on a simple rather than compound basis absent express authorization, we believe that the contract provision at question unambiguously and as a matter of law calls for compound interest.  Therefore, we reverse the district court's determination that the joint operating agreement between Exxon and CMR provided for simple interest.

In conclusion, we affirm the district court's determination that paragraph four of the COPAS accounting procedures, as applied here, did not violate § 15-1-5, reverse the district court's determination that the conclusive presumption applies to the amounts Exxon billed CMR for February and May 1985, and reverse the district court's determination that the joint operating agreement called for simple interest.

## B. APPEAL NO. 93-7525

The principal issue in this case is whether CMR has waived the gas-purchase contract's floor pricing provision which required

34

FGT to pay a price for CMR's gas not less than the price set forth under § 109 of the NGPA. The resolution of this case is controlled by the Uniform Commercial Code (UCC), which has been adopted by Mississippi. MISS.CODE ANN. § 75-2-107(1) (1981) ("A contract for the sale of minerals or the like (including oil and gas) ... is a contract for the sale of goods within this chapter....) (parenthesis in original). The applicable statutory provisions include MISS.CODE ANN. § 75-2-208(3), and § 75-2-209(2), (4).

Section 75-2-209(2) provides: "A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." This provision allows the parties to a contract to expand the UCC's statute of frauds provision. Thus, the parties may include in their contract a provision which requires *any* modification or rescission of the contract to be writing.

However, the UCC limits the effect of this provision by providing that "[a]lthough an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) [75-2-209(2), (3) ] it can operate as a waiver." MISS.CODE ANN. § 75-2-209(4) (1981). The UCC further provides that "[s]ubject to the provisions of section 75-2-209 on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." MISS.CODE ANN. § 75-2-208(3) (1981). Thus, "[t]he

35

combination of §§ [75-2-208(3) and 75-2-209(4) ] establishes that the parties course of performance after execution of the contract can operate as a waiver of specific contractual provisions." *T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 365 (5th Cir.1980).

In the instant case, the district court determined that CMR had waived enforcement of the § 109 floor price. *Crosby-Mississippi Resources v. Florida Gas Transmission,* 815 F.Supp. 977, 981 (S.D.Miss.1993). First, the district court determined that Stewart Gammill III "was aware from June 1987 forward that [CMR] was not being paid according to the 109 floor price even though [Stewart Gammill III] might not have known the exact amount of the floor price." *Id.* at 980. The district court concluded that CMR and FGT unsuccessfully attempted to modify the terms of the gas-purchase contract. *Id.* at 980-81. However, even though the attempt at modification proved unsuccessful because it was never put forth in a signed writing, the district court determined that CMR knew it was not being paid according to the § 109 floor provision and, because it continued to accept payment at a lower price, it had waived the contract's floor provision. *Id.* at 981.

On appeal, CMR asserts that the district court erred because it erroneously interpreted the following contractual provision:

> This Contract constitutes the entire agreement between the parties and no waiver, representation, or agreement, oral or otherwise, shall affect the subject matter hereof unless and until such waiver, representation or agreement is reduced to writing and executed by authorized representatives of the parties.

According to CMR, the preceding "no waiver" provision precludes a

finding of waiver because the provision expressly provides that no waiver is enforceable unless it is in writing. In response to this argument, the district court determined that the use of the word " "waiver' was not used as a term of art attempting to bring this contract out from subsection (4) of Miss. Code Ann. § 75-2-209 (1972)." *Id.* at 979. Rather, the district court determined that the word waiver was basically used synonymously for modification. *Id.*

As further support for its position, CMR relies on cases which have refused to recognize oral waivers in the face of no waiver clauses. *See, e.g., Marlowe v. Argentine Naval Comm'n,* 808 F.2d 120, 123 (D.C.Cir.1986). For example, in *South Hampton Co. v. Stinnes Corp.,* 733 F.2d 1108 (5th Cir.1984), this court rejected South Hampton's argument that a contractual provision had been waived. In *South Hampton,* we determined that Stinnes was justified in cancelling its contract with South Hampton because South Hampton had failed to construct shore tank facilities which were to be used to determine the quantity and quality of the product delivered to Stinnes, the buyer. *Id.* at 1116. In an effort to demonstrate that Stinnes had wrongfully cancelled the contract, South Hampton argued that the parties had agreed to change the contract's delivery requirements such that failure to construct shore tank facilities would not justify cancellation of the contract. *Id.* at 1117. According to South Hampton, the new delivery agreement was not a modification of the contract but a "waiver." *Id.* We concluded that the following contractual provision foreclosed South Hampton's

position: "[T]he contract may not be changed or terminated orally and no attempted change, termination or waiver of any of the provisions hereof shall be binding unless it is in writing." *Id.* In essence, South Hampton argued that *it* had waived enforcement of the original terms of the contract, which were intended to operate for its benefit. We emphasized the novelty of South Hampton's position:

> We note that South Hampton, in its offensive use of waiver theory, has taken a somewhat novel position. It insists that *it,* not Stinnes, has waived the shore tankage requirement. Consequently we are not called upon to decide if Stinnes's acceptance of product delivered on an out-turn basis constitutes a waiver of the shore tank requirement. Similarly, South Hampton has not argued that Stinnes' actions could be construed as a ratification of any modification.

*Id.* at 1118 n. 14. While we did determine that a no oral modification clause precluded South Hampton's waiver argument, we did not address the issue presented in this case.

Next, CMR attempts to attack the district court's decision by arguing that the district court erroneously concluded that it had affirmatively waived enforcement of the floor provision. First, CMR contends that the parties' previous course of performance in altering the gas-purchase contract's pricing provision demonstrates that it did not intend to waive the floor provision. Specifically, CMR asserts that this course of performance shows that the parties did not intend to change the contract absent a signed writing. Second, CMR contends that it did not accept or acquiesce in FGT's failure to comply with the floor provision. In support of this argument, CMR points this court to the following endorsement, which CMR apparently stamped on every check which FGT sent it:

38

"ACCEPTANCE AND ENDORSEMENT BY PAYEE DOES NOT CONSTITUTE A RATIFICATION, AMENDMENT, OR REVISION OF ANY OIL, GAS, AND MINERAL LEASE, POOLING, UNITIZATION AGREEMENT, OR JOINT OPERATING AGREEMENT NOT ALREADY EXECUTED BY PAYEE, NOR DOES PAYEE WAIVE ANY RIGHTS TO CORRECT MONIES DUE PAYEE." In this vein, CMR relies on § 75-1-207 which provides:

> A party who with *explicit reservation of rights* performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest" or the like are sufficient

(emphasis added). Finally, CMR attacks the district court's conclusion that it knew that FGT was not complying with the floor provision. In reaching its conclusion, the district court determined that "the parties entered into an oral or verbal agreement to change the original contract sometime prior to June 4, 1987, and that this agreement that they entered into verbally was basically as set out in the letter of June 4, 1987." *Crosby-Mississippi Resources,* 815 F.Supp. at 980. CMR attacks this finding by arguing that the testimony which the court heard was not credible. Specifically, CMR points out instances in the witnesses depositions which contradict their trial testimony. FGT, however, presented evidence from two witnesses that CMR and FGT entered into an oral agreement to waive the floor provision. After reviewing the record, we cannot say the district court's determination that CMR entered into an oral modification agreement was clearly erroneous.

Although CMR attempts to make much about the "no waiver"

provision, we do not believe that the provision should be interpreted as foreclosing a finding that CMR waived enforcement of the floor provision. *See Westinghouse Credit Corp. v. Shelton,* 645 F.2d 869 (10th Cir.1981) (anti-waiver provision itself may be waived). Further, we believe that CMR's interpretation of the contractual provision would cause an inequitable result in this case. Based on the district court's finding that CMR orally agreed to change the pricing terms and forego enforcement of the floor provision, CMR accepted payments, undisputedly below the floor provision, for about four and one-half years. Requiring FGT to pay the floor price after this consistent course of conduct would work a serious injustice because it would effectively deprive FGT of its right to "market out." In other words, if CMR had told FGT that it was not going to accept a price lower than the floor price, FGT could have exercised its right to market out; however, CMR's course of conduct has limited that possibility.

Moreover, we do not believe that the stamped notation on the backs of the checks, which was done in the ordinary course of business, precludes a finding that CMR waived enforcement of the floor provision. We do not believe that the district court clearly erred in determining that CMR's actions in this regard were not an "explicit reservation" of rights, especially in light of CMR's course of conduct in consistently accepting underpayments. In sum, we conclude that even though the parties' attempted modification was ineffective as such, the oral agreement to modify, coupled with the course of performance, demonstrates that CMR waived enforcement

40

of the floor provision. *E.g., T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 365-66 (5th Cir.1980) (determining that party had waived compliance with contract's notice provision because of the party's course of performance); *J.W. Goodliffe & Son v. Odzer,* 283 Pa.Super. 1487, 423 A.2d 1032, 1035 (1980) (determining that parties' attempted modification, when combined with a course of dealing over three years and involving hundreds of transactions, constituted a waiver of contractual provision).[10]

## IV. CONCLUSION

### A. APPEAL NO. 93-7519

For the foregoing reasons, we REVERSE the district court's determination that the operating agreement called for simple interest, REVERSE the district court's conclusion that the conclusive presumption applies to the amounts which Exxon billed CMR for February and May 1985, and AFFIRM the district court's judgment in all other respects.

### B. APPEAL NO. 93-7525

---

[10]CMR argues that the pretrial order does not list as a disputed issue the meaning of the term "waiver" in the no-waiver clause of the contract. Consequently, it argues that it did not have fair notice that the court would consider the term to be ambiguous. CMR reasons that the court could not properly construe the term against it without CMR having any advance notice that the meaning of the term "waiver" was a fact in issue. Contrary to CMR's protestations, the pretrial order is replete with references to issues of fact as to whether waiver had in fact occurred. Although the issues may not be worded as precisely as CMR would like, this court has never required—and indeed cannot require—technical perfection in pretrial orders. Moreover, CMR was fully aware of the trial court's interest in this specific issue about which they now complain, as is evidenced by the exchanges at oral argument on the pretrial motions for summary judgment.

41

For the foregoing reasons, the district court's judgment is AFFIRMED.